Richard E. DAVIS; Priscilla Davis, his wife, Appellants,

v.

PORTLINE TRANSPORTES MARITIME INTERNACIONAL.

No. 93–1430.

United States Court of Appeals, Third Circuit.

Argued Nov. 1, 1993.

Decided Feb. 22, 1994.

Sur Petition for Panel Rehearing and Suggestion for Rehearing In Banc March 28, 1994.

**534**

Simon W. Tache (Argued) Simon W. Tache, P.C., Philadelphia, PA, Attorney for Appellants.

Carl D. Buchholz, III (Argued), Michael P. Zipfel, Rawle & Henderson, Philadelphia, PA, Attorneys for Appellees.

Before: BECKER and STAPLETON, Circuit Judges, and RESTANI, Judge, United States Court of International Trade *.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This longshore worker's personal injury action arises out of a shipboard slip-and-fall. Plaintiff Richard Davis appeals from the district court's grant of summary judgment in favor of defendant Portline Transportes Maritime Internacional ("Portline"). We will af-firm in part, but because we conclude that Portline may have breached one of its duties toward Davis, we will reverse in part and remand for further proceedings.

## I. BACKGROUND FACTS [1]

On the bitter cold and blustery evening of January 7, 1992, Davis was injured while working aboard the *Baltasar Alvares,* a cargo ship owned by the defendant Portline. Carrying a cargo of bulk and bagged cement, she lay docked at Pier 60 on the Delaware River at Philadelphia for unloading. Davis was in the employ of NorVal Cement Company ("NorVal"), a stevedore and the operator of Pier 60.

NorVal had equipped the pier with a "si-wertell," a large device used to remove bulk cement from the hold of a ship. A siwertell is moved on wheels and has a boom that extends over the ship to access its hatches. Attached to the end of the boom is a funnel, at the far end of which is an auger-like spiral that longshore workers maneuver to bore and vacuum cement out of the hold of a ship, ensuring that it constantly remains within a pile of bulk cement. A conveyor belt carries the cement sucked from the hold along the boom to a discharge valve or kettle, from which it is transferred into warehouses on the pier. A longshore worker operates the siwertell while perched on a catwalk alongside the hatch. The operation emits a large amount of cement dust in the vicinity of the worker.

On the night of his injury, January 7, 1990, Davis, who regularly worked the late shift (7:00 p.m. to 7:00 a.m.), was assigned to operate the siwertell from the *Baltasar Alvares'* Number 5 hatch. When Davis arrived for work, a malfunctioning (leaking) discharge valve—which causes an unusually heavy amount of cement dust to spill onto the deck—had brought the discharge operation to a standstill, and work did not resume until 9:00 p.m. Following the completion of repairs, Davis' co-worker Frank Socha took the

---

* The Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

1. The facts are drawn primarily from the deposition testimony of Davis and of his gang boss Harlington Randolph.

first shift, and Davis did not begin operating the siwertell until around 10:00 p.m.

At that time, Davis ascended the gangplank to take up his post. Once on board, he turned right to walk the 25–30 feet along the inshore deck to the Number 5 hatch. He observed several black grease spots along the railway of the ship, each a thin layer about two-three feet in diameter, but walked around them without giving them much thought and continued to his station without stepping into the grease or noticing any other foreign substance on the walkway. There he relieved Socha and climbed onto the catwalk, positioned three feet off the ground, to begin his hour-long rotation.

The source of the spots Davis had encountered is unknown. Davis did not notify the ship's crew or his gang boss Randolph of the spots because he did not consider grease spots on the deck unusual and, as a rule, did not complain about them. Davis testified that the longshore workers would sometimes blanket grease spots with cement dust to eliminate the slippery conditions, but that it was the customary responsibility of the ship's crew to cover or clean them up. On that particular night, however, he did not notice any member of the crew present on the ship cleaning any grease spots or covering them with an absorbent.

When Davis took his position, the surrounding area of the ship was dark, but poor lighting was typical, and Davis did not complain about it. A light on top of the siwertell, which shone through the hatch into the hold so the longshore worker could properly position the funnel, was the sole source of illumination. The dust that night was heavy, as usual, because the discharge operation by its nature emits copious amounts of cement dust around the worker.

While Davis was operating the siwertell, the gangboss Harlington Randolph witnessed a crew member wearing a blue uniform—the second mate—hosing down the deck with a large hose, washing cement dust deposited on the deck over the edge of the ship into the Delaware River. He was positioned at the back of the ship, but was spraying the water along its entire length. The temperature was frigid. Randolph recalled he had to wear two hats and sweaters because it was "[f]reezing, cold." But Randolph did not see any crew members apply sawdust or any other absorbent material to the deck afterwards.

Randolph testified that at approximately 11:00 p.m., he communicated with Davis by walkie-talkie to notify Davis he was coming to relieve him. After mounting the gangplank (apparently for the first time that evening), Randolph turned right toward Davis, whistled at him on the catwalk, and bid him to take a break. Davis dropped down from the catwalk and started to walk "[m]aybe a couple feet" toward Randolph when he slipped and fell on "grease and ice [which was] all mixed up ... because it was frozen." Davis testified that he did not notice the slippery spot on which he fell until he had fallen into it, perhaps because a layer of cement dust covered it. As noted above, the area was poorly lit, and Davis approached the area with the only light, attached to the top of the siwertell, behind him.

The spot where Davis slid was located in the middle of the walkway, which was about five feet wide, and Davis first noticed it after he fell. When questioned as to the source of the spot and wetness, and how long it had been there, Davis stated that he did not know, but opined that it was perhaps caused when some crew member hosed down the deck to remove the cement dust while Davis was working at his station.

Randolph was within ten feet of Davis when the latter fell. He described the slippery patch as "[c]ement frozen up from the water" which looked like chalk; he also noticed that Davis had left skid marks where he had slipped. Randolph helped Davis up and rushed him to the hospital. Davis underwent treatment, but was able to return several hours later to complete his shift. At that time he easily walked past the spot where he had earlier fallen. At dawn, when visibility had improved, Davis noticed that nobody had yet cleaned up the spot where he had slipped.

Davis brought this suit against the vessel under § 5(b) of the Longshore and Harbor Workers' Compensation Act (the "Act"), 33

U.S.C.A. § 905(b) (1986),[2] to recover damages for the physical injuries he sustained. The district court had jurisdiction pursuant to 28 U.S.C.A. § 1331 (1993), as the case involves a cause of action arising under federal law, and also under 28 U.S.C.A. § 1332(a)(2) (1993), since the alleged damages exceeded $50,000 and Davis is a citizen of Pennsylvania, whereas Portline is a Portuguese corporation with its principal place of business located outside of the United States. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (1993).

■ In reviewing the district court's grant of summary judgment we exercise plenary review, and employ the same standard applicable in the district court. *E.g., Public Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 76 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). As to that standard, we apply the now familiar jurisprudence of the Supreme Court's trilogy of *Celotex Corp. v. Catrett,* 477 U.S. 317, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which has been so oft cited that we simply set it forth in the margin.[3]

## II. GOVERNING LEGAL PRINCIPLES: THE DUTIES OF A SHIPOWNER

The seminal case in this area is *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).[4] There the Supreme Court interpreted Congress' 1972 amendment of § 5 of the Act as replacing the old doctrine of seaworthiness, according to which a vessel was generally strictly liable for injuries longshore workers suffered while on board, with a negligence standard that the courts were to develop by applying general land-based doc-

---

**2.** Section 5(b) of the Act provides in pertinent part:

In the event of injury to a person covered under this chapter caused by the negligence of a *vessel,* then *such person ...* may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel *except remedies available under this* chapter.

33 U.S.C.A. § 905(b) (1986).

**3.** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). Once the moving party comes forward and identifies "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions in file, together with affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial," *id.* at 322, 106 S.Ct. at 2552. In evaluating whether the non-moving party established each element of its case, we must resolve all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88, 106 S.Ct. at 1356; *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 159, 101 S.Ct. 1614, 1618, 68 L.Ed.2d 1 (1981). "We are keenly aware that credibility determinations are not the function of the judge; instead the non-movant's evidence must be credited at this stage." *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); *see Kirsch v. Plovidba,* 971 F.2d 1026, 1027 n. 1 (3d Cir.1992).

**4.** Whatever differences may lurk between the standards of care articulated by the separate concurrences in *Scindia* and the plurality, both concurrences joined in the plurality's opinion. *See id.,* 451 U.S. at 180, 101 S.Ct. at 1628 (Brennan, J., concurring); *id.* (Powell, J., concurring). In recognition thereof, this Court in *Kirsch v. Plovidba,* 971 F.2d 1026, 1028–29 (3d Cir.1992) adopted the plurality opinion (to which only three Justices subscribed) as the law of this circuit. We therefore do not label the plurality opinion in *Scindia* as such herein.

trines of tort law. The Supreme Court pursued that mission in *Scindia.*

■ In *Scindia* the Court recognized at least three distinct duties that a shipowner owes a stevedore (and its longshore employees) under § 5 of the Act, namely, the "turnover duty"/"duty to warn," the "active operations duty," and the "duty to intervene." Because the duty on which our decision turns is the active operations duty, we essentially limit our discussion thereto. We do pause to note, however, why we believe the district court properly granted Portline summary judgment with respect to the other two duties, both of which Davis alleged Portline breached. The turnover duty/duty to warn applies only at the moment the vessel initially turns control of the ship over to the stevedore, *see Kirsch v. Plovidba,* 971 F.2d 1026, 1029 (3d Cir.1992), but Davis has not presented any evidence sufficient to show that the hazardous spot on which he fell existed at the time Portline turned the ship over to NorVal (indeed, the evidence strongly suggests the hazard formed only shortly before Davis' slip), or that Portline knew it existed at that point in time.[5] With respect to the duty to intervene, Davis proffered no evidence admissible under Federal Rule of Civil Procedure 56, *see Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, tending to show that Portline actually knew of the hazard,[6] nor did he cite any duty Portline had to inform itself of the hazard, and hence the duty to intervene did not arise, *see Scindia,* 451 U.S. at 172, 101 S.Ct. at 1624; *Kirsch,* 971 F.2d at 1029.

As to the active operations duty, *Scindia* explained that "the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman, or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." 451 U.S. at 167, 101 S.Ct. at 1622. This formulation lies in stark contrast to the rule applicable when the vessel does not actively involve itself in the cargo operations, in which event the vessel may rely and depend on the experience and expertise of the stevedore. Thus, for example, under the other two duties the vessel need not supervise or inspect the stevedoring operation to discover and correct dangerous conditions which develop within the cargo areas as a result of those operations. *See id.* at 168–69, 101 S.Ct. at 1622–23.

■ The active operations duty applies to those areas under the vessel's active control, even if the stevedore shares control with the vessel or if at some earlier time the area was under the stevedore's exclusive control. *See Moore v. M.P. Howlett, Inc.,* 704 F.2d 39, 40–41 (2d Cir.1983) (upholding a jury verdict in favor of a longshore worker who slipped on an obviously greasy, icy deck of a barge-crane which the vessel and stevedore jointly controlled and operated). The duty incorporates general principles of land-based negligence law, *Hodges v. Evisea Maritime Co., S.A.,* 801 F.2d 678, 684 (4th Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1572, 94 L.Ed.2d 764 (1987); *see Scindia,* 451 U.S. at 165 n. 13, 167, 101 S.Ct. at 1621 n. 13, 1622, and we will repeatedly refer to these principles in the ensuing discussion.

## III. THE DISTRICT COURT'S OPINION

■ The district court granted summary judgment for Portline, finding in substance that it had breached none of the *Scindia* duties. In concluding that Portline had not

---

**5.** Davis has not argued that the turnover duty/duty to warn re-attaches whenever the vessel, having asserted control over an area of the ship while the stevedore was aboard, later returns control over that area to the stevedore, so we do not consider that issue.

**6.** Davis did submit an affidavit by Ronald Jones, who expressed his "professional opinion" that Portline "knew" that the cement would freeze on the deck of the ship and become slippery. But we reject this "evidence" because for at least one reason it is inadmissible under Federal Rule of Civil Procedure 56(e): Jones did not demonstrate in his affidavit that he was competent to aver to the fact of Portline's knowledge, as he provided no support for a finding that he had personal knowledge of the matters attested to, FED.R.EVID. 602, *see* FED.R.CIV.P. 56(e) ("[A]ffidavits ... shall show affirmatively that the affiant is competent to testify to the matters stated therein."), nor did he explain how his supposed expertise bore on that issue.

breached its turnover duty, the court reasoned:

> Regardless of whether the slippery area on the deck was ice or grease or a combination of both and what created the condition, the area did not constitute the type of unavoidable hazard that would render the shipowner liable to plaintiff. Plaintiff testified that he noticed the slippery area and avoided it when he walked to his post at the start of his shift. Such a condition does not expose the shipowner to liability. *See Kirsch,* 971 F.2d at 1030; *cf. Moore v. M.P. Howlett, Inc.,* 704 F.2d 39, 41 (2d Cir.1983) (reversing trial court that granted shipowner judgment notwithstanding the verdict in case in which "the entire deck ... had been covered for at least three days with ice, water and grease"); *Celestine v. Lykes Bros. S.S. Co.,* 729 F.Supp. 691, 692 (N.D.Cal.1989) (granting shipowner's motion for summary judgment in case brought by plaintiff who tripped over a coil of wire that "he had passed ... many times without incident prior to the accident").

*Davis v. Portline Transportes Maritime Internacional,* No. 92–0096, mem. op. at 9–10, 1993 WL 101202 (E.D.Pa. Apr. 6, 1993). This excerpt clearly reveals that the district court hinged its conclusion on the assumption that the place Davis slipped was the same place that he had passed on his way to the Number 5 hatch. Accordingly, the district court must have surmised the place where Davis slipped was "obvious," known to Davis to be slippery, as well as readily avoidable.

The court next addressed Davis' argument that Portline breached its active operations duty by hosing down the deck and thereby creating a slippery condition during the stevedoring operation. Davis argued that this act exposed him to an unreasonable risk of harm and that, alternatively, by not warning him of the danger, Portline breached its duty to intervene. The court rejected Davis' arguments:

> It does not matter which duty applies because the slippery spots on the deck did not constitute the type of hazardous condition for which the shipowner would be liable. First, ... plaintiff could avoid the slippery spots while walking along the deck. Moreover, neither plaintiff nor Randolph testified that the slippery spots constituted a hazardous condition for an experienced longshoreman.

> . . . . .

> Because the slippery spots on the deck were both obvious and avoidable, they did not constitute the type of hazardous condition for longshoremen that would expose a shipowner to liability.

*Id.,* mem. op. at 10–11, 1993 WL 101202. Again, besides its explicit determination that the "slippery spots [on which Davis fell] were both obvious and avoidable," the district court impliedly assumed the spot where Davis slipped was obvious: it applied the analysis the Supreme Court in *Scindia* and this Court in *Kirsch* forged for obvious dangers in an area under the *stevedore's* control, namely, whether an *experienced* stevedore and its *experienced* longshore worker employees could, with the exercise of reasonable care, safely carry on in the workplace. *See Scindia,* 451 U.S. at 166–67, 101 S.Ct. at 1622; *Kirsch,* 971 F.2d at 1029–30.

The above passages read in the context of the district court's entire opinion reveal that the linchpin of the district court's decision was its belief that Davis contradicted himself in his deposition about the grease spots he maneuvered by on his way to the Number 5 hatch and the spot where he later fell. As we have intimated above, we disagree with the district court's conclusion, and Portline's assumption throughout the bulk of its brief, that any hazard on the ship was obvious and known to Davis. That erroneous conclusion is evidently predicated on Davis' concession that he saw and maneuvered around several grease spots on his way to the Number 5 hatch taken in conjunction with the district court's apparent theory, based on a deposition passage it quoted in its opinion, that the spot where Davis fell was the same spot he had avoided on his way to his station:

> Q: Did th[e] grease extend out into the walkway or was there room for you to walk by?
>
> A: I guess there was room for me to walk by.

Q: When you were going to the Number 5 hatch to start work, did you step in the puddles of grease?

A: No, only when I was coming back.

Davis' last answer appears to imply that he fell when he was coming back in one of the very spots he had observed on his way to his station. However, the immediately preceding portion of the transcript reveals that Davis was somewhat confused at that point in his testimony:

Q: Do you know how long [the grease] was there before you came on at 10 o'clock?

A: *Yeah.*

Q: How long was it there?

A: *I don't know.*

Thus, Davis may have mistakenly thought that the question posed to him referred to the ice/grease mixture which he claims he fell in, rather than the grease spots he claims he avoided. Later testimony demonstrates clearly that Davis fell in a spot different from the *grease* spots he had encountered on his approach to the Number 5 hatch:

Q: When did you first see or notice what you slipped on?

A: *When I first fell.*

Q: What did you notice at that time?

A: *It was wet.*

The following excerpt is equally revealing in light of Davis' unequivocal and oft-repeated admission that he saw the several grease spots while proceeding to his station:

Q: Had you walked through [the area where you fell] on the way to the Number 5 hatch at 10 o'clock?

A: I had to.

Q: Did you see it at that time?

A: *I didn't even notice it.*

Q: Was it there at that time?

A: It could have been.

Q: You didn't see it?

A: *No.*

Besides that testimony, Davis attested elsewhere that he easily avoided the spot where he fell when he returned to the Number 5 hatch after his release from the hospi-

tal, impliedly suggesting that he did not perceive the hazard at the time he jumped down from the catwalk to take his break on the pier. Finally, there was evidence that the spot where Davis fell was hidden, as it was covered by cement dust, the air was laden with cement dust, and the lighting condition was poor, and, moreover, that Davis' body may have been positioned between the light and the defect (depending on the light's trajectory relative to the spot), further obscuring the hazardous condition from view.

Thus, when we take Davis' testimony as true and resolve all inferences in his favor, we ineluctably conclude that a reasonable jury could find that the hazardous spot where Davis fell formed while Davis worked on the catwalk and that Davis was unaware of the spot until his fall. Had the district court properly resolved all inferences in Davis' favor instead of emphasizing potential inconsistencies in his testimony, we think it too would have reconciled his testimony and not granted summary judgment in favor of Portline. Before finalizing this conclusion, however, we must explain the contours of the active operations duty.

## IV. THE ACTIVE OPERATIONS DUTY

### A. *Introduction*

The gravamen of Davis' claim is that Portline breached its active operations duty because the second mate's hosing down of the deck created a non-obvious hazard which breach proximately caused his injury. In Davis' submission, because the crew remained on the deck and a crew member exercised control over the deck when he hosed it down, the hazard formed "in areas ... under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622.

The parties and the district court all presumed that the preliminary question with respect to the active operations duty is whether the hazard was obvious or known to the longshore worker. The district court granted summary judgment for Portline, as far as we can ascertain, because it concluded that the danger was obvious, known to Davis, and easily avoidable. But we noted in

*Kirsch* that the obviousness determination is generally for the jury to make. Although in *Kirsch* obviousness was not an issue, the plaintiff having conceded he saw the oil spill into which he stepped (his injury occurred later when he slipped on oil which remained on his shoe) and that the spill was obvious, 971 F.2d at 1027, we did state that:

> [A]s the [House] committee report [accompanying the amendment of § 5 of the Act] suggests, the situation where a longshore worker slips and falls on an oil spill that was not obvious to the worker in the performance of his or her duties is the paradigmatic case where an action lies against the shipowner for negligence. In many cases, the obviousness of a hazard will be a reasonably disputed issue of fact inappropriate for resolution by the district court on summary judgment.

*Id.* at 1030 n. 5; *accord id.* at 1033 ("[I]n many cases the obviousness of a hazard under all the circumstances, which includes as a key element the appreciability of the danger, will be a jury question."). As we concluded *supra* at 538, we believe the district court erred in holding that the danger was obvious as a matter of law.

■ Davis argues on appeal that he did not see the spot where he fell and that the slippery nature of that spot was not obvious. Taking all reasonable inferences from the facts in his favor, as developed in the preceding section, we believe that this argument is one a reasonable jury might find persuasive. But we do not think to survive summary judgment Davis must carry the day with it, as the obviousness determination does not nearly have the dispositive ramifications which the district court and the parties assign to it. Rather than setting up a bar to recovery, as the district court presumed, the obviousness of a danger, or the injured worker's actual knowledge of it, is pertinent with respect to the active operations duty only insofar as it evinces the worker's comparative fault.

■ That is, even if we shared the district court's view that a reasonable jury must conclude that the danger was obvious, known to Davis, and easily avoidable, we still would not affirm its order granting Portline summary judgment because we cannot conclude as a matter of law that Portline was 0% and Davis was 100% at fault. So long as the jury could find Portline negligent for creating an icy spot on the deck of the ship, it could attribute some fault to Portline, and, as federal maritime law embodies a system of "pure" comparative negligence, that would suffice to preclude summary judgment. *See Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939) ("Under [the admiralty doctrine of comparative negligence] contributory negligence, however gross, is not a bar to recovery but only mitigates it."); *Sosebee v. Rath*, 893 F.2d 54, 55 n. 2 (3d Cir.1990) ("[A]dmiralty law allows for pure comparative negligence...."); *cf. The Max Morris v. Curry*, 137 U.S. 1, 14–15, 11 S.Ct. 29, 33, 34 L.Ed. 586 (1890). The focus on obviousness in *Kirsch*, 971 F.2d at 1031, was linked to the turnover duty and in *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 496 (3d Cir.1987), *cert. denied*, 486 U.S. 1007, 108 S.Ct. 1733, 100 L.Ed.2d 196 (1988), to the duty to warn; here, we must come to grips with the active operations duty, a duty which contrasts materially from the duties *Derr* and *Kirsch* considered.

### B. *What Triggers the Active Operations Duty*

■ A vessel may be liable to a longshore worker only when the vessel, whether acting jointly with the stevedore or individually, breached a duty it owed the injured worker. In the longshoring context, we hold that to trigger the active operations duty, the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook. *Cf. Sarauw v. Oceanic Navigation Corp. (Sarauw I)*, 622 F.2d 1168, 1172 (3d Cir.1980), *vacated*, 451 U.S. 966, 101 S.Ct. 2039, 68 L.Ed.2d 344 (1981), *reinstated (Sarauw II)*, 655 F.2d 526 (3d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1252 n. 38 (3d Cir.1977), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The

purpose behind the control/charge component is to ensure that the vessel is not held vicariously liable for injuries the stevedore causes and that the active operations duty does not supplant the turnover duty/duty to warn and duty to intervene in areas under the stevedore's control. *See* REST.2D TORTS § 431 cmt. *a. See generally infra* Part IV.F. Thus, for example, the vessel's mere reservation of the right to intervene to protect the ship's and its crew's interests, or to eject the stevedore at any time, does not amount to the substantial control necessary to trigger the vessel's active operations duty as long as the vessel does not exercise those reserved rights.

 A jury may find that the vessel exercised control or took charge over an area either because it never turned exclusive control of the area over to the stevedore but retained substantial control, or because the vessel substantially interfered, by invitation or otherwise, with the stevedore's exercise of exclusive control, such as by actively intervening in the area. We think the evidence here sufficient for the question of the attachment of the active operations duty to go to a jury. Assuming for the moment that the vessel at some point had turned exclusive control of the deck over to the stevedore, a jury could reasonably conclude that the vessel substantially interfered with the stevedoring operations when it hosed down the deck of a portion of the ship the longshore workers used for ingress and egress to rid it of cement dust. That is, a jury could determine that when the second mate introduced a foreign substance onto the deck, he exercised control over it and actively operated in the area.

Alternatively, a finding of active control is supported by the testimony indicating that the crew generally remained on the affected portion of the deck during the stevedore's unloading operations and that the crew was responsible for maintaining the deck, evidence which tends to show that the crew never turned exclusive control of the area over to the stevedore but retained substantial control over the area. Here both Davis and Randolph testified that it was customary for the vessel, not the stevedore, to maintain the deck by removing slippery conditions. In other words, the vessel did not maintain the deck only in extraordinary situations when it needed to exercise its reserved powers because the stevedore neglected its responsibility to do so. In sum, the area may have been under the actual control of the ship rather than contained within the exclusive confines of the stevedore's cargo operations. *Cf. Sarauw II,* 655 F.2d at 528 (holding that a gangplank supplied by the stevedore and used exclusively by a longshore worker was not within the confines of the cargo operations within the meaning of *Scindia* because the gangway was a "basic appurtenance of the vessel").

## C. *Elements of the Active Operations Duty*

 Adapting general land-based concepts of negligence to the maritime context, we hold that the four elements of a prima facie case of breach of the active operations duty by a longshore worker against a vessel are: (1) that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of harm, or (ii) protect himself or herself against the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition. *See Sarauw I,* 622 F.2d at 1173 (quoting *Griffith v. Wheeling–Pittsburgh Steel Corp.,* 610 F.2d 116, 126 (3d Cir.1979)); REST.2D TORTS § 343;[7] W. PAGE

---

7. Section 343 of the Restatement (Second) of Torts provides:

 *Dangerous Conditions Known to or Discoverable by Possessor*

 A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

 (a) knows or by the exercise of reasonable care would discover the condition, and should

Keeton et al., Prosser and Keeton on the Law of Torts § 61, at 425–28 (5th ed. Law. ed. 1984); *cf. Scindia*, 451 U.S. at 175–76, 101 S.Ct. at 1626 (areas under the stevedore's charge or control). The deposition testimony clearly suffices to create triable issues of fact as to whether under all the circumstances Portline breached each of these elements of its active operations duty.[8]

First, a reasonable jury could decide that the vessel knew or should have known that the water made or would make the deck slippery. Randolph testified he saw the sec-

ond mate hosing down the deck. He testified further, and the weather forecast for the night of January 7, 1990 corroborates, that the temperature dipped below freezing. As a result, a jury could conclude the second mate knew or should have known that the water could mix with other substances and in any case could freeze and become slippery. Alternatively, a jury may conclude that under the circumstances a reasonable vessel would have periodically inspected the deck over which it exercised substantial control for hazardous conditions, but that this vessel failed so to do.[9]

realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Rest.2d Torts § 343. A stevedore is an "invitee" for purposes of land-based distinctions in duties owed to various categories of persons. *See Hurst*, 554 F.2d at 1249 & n. 33; Rest.2d Torts § 332(3); 5 Fowler v. Harper et al., The Law of Torts § 27.12, at 223 (2d ed. 1986).

Finding no inconsistencies with federal maritime policy or law, we have adapted the Restatement's approach to accommodate the principles of federal maritime law as *Scindia* enunciated. *See Kirsch*, 971 F.2d at 1033. We believe that under such conditions the Restatement furnishes a useful, considered guide for defining the ordinary land-based principles of negligence which the active operations duty incorporates. *Cf. Kirsch*, 971 F.2d at 1031–33 & nn. 9–10; *Scindia*, 451 U.S. at 180 n. 1, 101 S.Ct. at 1629 n. 1 (Powell, J., concurring); *see also Scindia*, 451 U.S. at 168 n. 14, 175, 101 S.Ct. at 1622 n. 14, 1626. Some portions of the Restatement's approach, however, clearly do not fit within the paradigm the Act constructs. For instance, the Restatement accepts the common law defenses of assumption of risk and contributory negligence, *see* Rest.2d Torts §§ 463–96, 496A–G, doctrines which the Act rejects, *see infra* at 544–45.

These doctrines surface indirectly at various other points in the Restatement, and in particular are embedded into the standards of care set by Restatement (Second) of Torts §§ 341A and 343A. *See id.* § 341A cmt. *a; id.* § 343A cmt. *e; Griffith v. Wheeling–Pittsburgh Steel Corp.*, 610 F.2d 116, 125 (3d Cir.1979), *vacated sub nom. American Commercial Lines, Inc. v. Griffith*, 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981), *reinstated*, 657 F.2d 25, 28 (3d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *Rich v. United States Lines, Inc.*, 596 F.2d 541, 551 n. 21 (3d Cir.1979); *id.* at 565 (Garth, J., concurring); *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 n. 10 (3d Cir.1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d

361 (1977). We must, of course, decline any invitation to superimpose inconsistent land-based tort theories on federal maritime law as expressed by the Act and will purge them from any land-based standard we find otherwise fit to borrow. *See Rich*, 596 F.2d at 547 ("[I]n this Circuit, only those sections of the Restatement which are clearly consistent with the purposes and policies of the Act have been applied."); *id.* at 565 (Garth, J., concurring) (arguing that the best course "would be to apply §§ 343–343A in section 5(b) actions but to substitute for the doctrines of contributory negligence and assumption of risk insofar as they are reflected in these provisions the doctrine of comparative negligence long applied in the maritime law"); *cf. Hurst*, 554 F.2d at 1248–49 (refusing to apply Restatement (Second) Torts § 318 because of an incompatibility with Congress' intent in amending the Act).

8. We think that, once having established a breach of a duty, the record readily establishes the elements of causation and damages, so we may pretermit a protracted discussion of those remaining elements of a negligence claim.

9. *See Sarauw II*, 655 F.2d at 528 (referring to the vessel's "general duty"—with respect to areas over which it shares control, *see id.* at 529 (Adams, J., concurring)—"to use reasonable care to inspect and supervise for the purposes of discovering and remedying dangerous conditions which might exist or develop"); Rest.2d Torts § 343 cmt. *b* ("To the invitee the possessor owes not only [the duty to disclose to him dangerous conditions which are known to the possessor], but also the additional duty to exercise reasonable affirmative care to see that the premises are safe for the reception of the visitor...."); Keeton et al., Prosser and Keeton on the Law of Torts § 61, at 426 (The occupier must "act reasonably to inspect the premises to discover possible dangerous conditions of which he does not know and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use of the property." (footnotes omitted)); *see also* H.R.Rep. No. 1441, 92d Cong.,

Second, a reasonable jury could find that the vessel knew or should have known the potential resulting slippery conditions would pose an unreasonable risk of injury to longshore workers traversing the deck. This element subsumes, first, the fundamental question whether there was a *danger vel non* (regardless of whether the vessel knows or should know about the condition), and, second, whether a reasonable vessel, assuming knowledge of the condition, would appreciate the danger the condition posed. It cannot really be debated whether ice is dangerous. As to the second subissue, the vessel here arguably knew or should have known that ice, perhaps mixed with cement dust and some grease, covered by dust on the deck of a gloomy ship, posed an unreasonable risk of harm to the longshore workers it knew to be present thereon.

Third, a reasonable jury could determine that the vessel should have foreseen injury from the danger because it should have expected that a longshore worker may not discover the danger or apprehend its severity (severity being measured as the gravity of harm by its probability of occurring). Both Davis and Randolph testified the lighting was inadequate on the deck and that operation of the siwertell emitted large quantities of cement dust into the air, further inhibiting visibility. In addition, the emission of cement dust from the operation of the siwertell would in the normal course of events cover the ice with a layer of dust, obscuring the ice underneath from perception by the longshore workers. We stress that insofar as the Act forges a system of comparative fault, the fact that a longshore worker would suffer injury only if personally negligent (for example, because the hazard was obvious) would still satisfy this element *if* the worker's inattentiveness or other negligence was reasonably foreseeable. We cannot permit the rejected doctrines of contributory negligence and assumption of risk to slip in the back door.

Fourth and last, on the evidence in the record a reasonable jury could resolve that the crew failed to exercise reasonable care to protect those present on the ship against the danger. The testimony established that the crew failed to improve the lighting, spread salt, sand, or an absorbent on the ice, or alert the longshore workers to the hazard. We stress that this fourth element, like the others, is not a vehicle for subtly introducing the concepts of assumption of risk or contributory negligence into the vessel's standard of care. Rather, this element may absolve the vessel of all *fault* not because of what the injured worker did (for instance, confront an obvious hazard despite a warning and for no good reason), but because under all the circumstances the vessel took every reasonable step to eliminate or prevent the danger and protect those aboard the ship against injury. Accordingly, the evidence in the record was adequate to preclude summary judgment in favor of the defendant.

### D. *The Role of Obviousness and the Longshore Worker's Knowledge*

We acknowledge the possibility, though, that the fact finder might determine that, while Portline was negligent, the hazard was obvious or that Davis actually knew that danger was underfoot, invoking the need to apportion fault for Davis' injury between Davis and Portline. Accordingly, for the guidance of the district court on remand, we make the following observations.

■ We have not yet defined what is obvious for purposes of the Act. The plain meaning of the word connotes something effortlessly and readily perceived, *see* WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (Philip B. Gove ed. 1966), but we need to clarify from whose perspective obviousness is gauged. We consider a hazard to be obvious, for purposes of the *Scindia* active operations duty, if a reasonable longshore worker under all the circumstances would actually have noticed the hazardous condition exists *and* would actually have appreciated the true significance (probability and gravity) of the threatened harm. *See* REST.2D TORTS § 343A cmt. *b; cf.*

2d Sess. 6, 7 (1972) (explaining that the bill does not derogate "the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condi-

tion"), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704; S.REP. No. 1125, 92d Cong., 2d Sess. 10, 11 (1972) (same); 118 CONG.REC. 36,273 (1972) (prepared statement of Sen. Williams) (same).

*Kirsch,* 971 F.2d at 1033 (emphasizing the appreciability of the danger).

If the danger was obvious, for purposes of the active operations duty, Portline is not automatically relieved of accountability for Davis' injuries. "The fact that neither plaintiff nor the stevedore took any precautions in the face of this [obvious] hazard does not relieve defendant of responsibility, for it is fundamental that there may be more than one proximate cause of an injury." *Moore v. M.P. Howlett, Inc.,* 704 F.2d 39, 43 (2d Cir. 1983) (applying the active operations duty without labeling it as such); *see Rich,* 596 F.2d at 565 & n. 32 (Garth, J., concurring); *cf. Kirsch,* 971 F.2d at 1031 (explaining in context of the turnover duty that when a shipowner knows or should know a longshore worker can not or will not avoid an obvious hazard, the shipowner is liable for not eliminating the hazard according to its comparative fault). In *Moore* a longshore worker was injured as he tried to escape a 50–pound hook which was falling toward him as he stood on an obviously greasy, icy deck. He had noticed the condition of the deck before coming aboard, yet had failed to complain about the danger. The vessel had exclusive responsibility for maintaining the deck. 704 F.2d at 41. The Second Circuit reversed a judgment n.o.v. in favor of the vessel because the jury, which apportioned the longshore worker's damages between him and the vessel under a theory of comparative fault, "could have found that the stevedore, shipowner, and plaintiff all unreasonably believed that the longshoreman could perform his duties on the barge without injury." *Id.* at 43. We find *Moore* especially instructive with respect to its treatment of comparative fault.

As we have already stated, the Restatement furnishes a useful guide for defining the governing principles of negligence when the danger is not obvious or known to the invitee. *See supra* at 541 n. 7. Under the Restatement's approach, when a danger is obvious or known to the invitee, the standard of care changes and a possessor is not liable for injuries the invitee sustains *"unless the possessor should anticipate the harm despite such knowledge or obviousness."* REST.2D

TORTS § 343A (emphasis added). We decline to adopt this standard of care, though, for it patently adjusts the possessor's duties based on the obviousness of the danger or the invitee's knowledge thereof, *see* REST.2D TORTS § 343 cmt. *a,* an adjustment we find plainly inconsistent with federal maritime law and policy rejecting the doctrines of contributory negligence and assumption of risk:

> As a general matter, courts have discussed the "open and obvious hazard" issue as a question of the shipowner's duty, rather than under the rubric of comparative negligence. This difference is crucial, for a finding of no duty means that the plaintiff cannot recover at all, whereas a finding of comparative negligence only reduces the plaintiff's recovery by a percentage. The difference is also troubling, because the no-liability result under the "duty" analysis is similar to the result under the outmoded common law tort doctrines of contributory negligence and assumption of risk, doctrines that Congress rejected in 1972.

*Kirsch,* 971 F.2d at 1031 n. 6; *see supra* at 541 n. 7.

When the active operations duty is involved, the Act adjusts the vessel's liability for obvious dangers or those dangers the longshore worker knows of only by the worker's comparative fault. The legislative history of the 1972 amendments clearly and unequivocally provides that:

> the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable.

H.R.REP. No. 1441, 92d Cong., 2d Sess. 8 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4705; *accord* S.REP. No. 1125, 92d Cong., 2d Sess. 12 (1972). Many cases, many binding upon us, have unreservedly granted this legislative history the force of law, see *Scindia,* 451 U.S. at 165 n. 13, 101 S.Ct. at 1621 n. 13;

*Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 258 n. 2, 268 n. 23, 99 S.Ct. 2753, 2755 n. 2, 2760 n. 23, 61 L.Ed.2d 521 *reh'g denied,* 444 U.S. 889, 100 S.Ct. 194, 62 L.Ed.2d 126 (1979); *Kirsch,* 971 F.2d at 1031 & n. 6; *Sarauw I,* 622 F.2d at 1170 n. 3, 1173; *Rich,* 596 F.2d at 565 & nn. 32–33 (Garth, J., concurring); *Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 862, 863 n. 10 (3d Cir.1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); and *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31, 44 (3d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), to cite but a few. As we have already observed *supra* at 540, the Act uses a system of pure comparative fault (meaning the worker may recover although his or her fault exceeds 50%).

Portline contends that Davis cannot recover anything if the spot on which he fell was obvious. Specifically, it maintains that it matters not whether Davis *actually* observed the slippery spot on which he fell, but that instead the proper inquiry is (i) whether the hazardous condition was normal, (ii) whether Davis should have anticipated it, and (iii) whether he should have observed it. Br. of Appellee at 26. The substance of this argument appears to be that, because the hazard was obvious, even if Portline was negligent, Davis was contributorily negligent, barring his recovery under the active operations duty. Portline argues concomitantly that, because of Davis' supposed expertise and experience, the ship was entitled to expect him to cope with the hazardous condition. In effect, Portline attempts to inject the inappropriate notion of an experienced longshore worker and the rejected doctrine of contributory negligence into its standard of care in the hope of accomplishing indirectly what it could not accomplish directly.

We will reject this effort, though, for the reasons mentioned *infra* Part IV.E and *supra* at 541 n. 7, 544. As we have just spent considerable effort explaining, if Davis injured himself in an area over which the vessel exercised substantial control, the active operations duty governs, and neither contributory negligence nor assumption of risk is a bar to recovery, whether the bar be raised directly or obliquely by means of circumscribed standards of care which by their nature embrace those rejected doctrines. If the jury finds that Portline breached the active operations duty, that the hazard would not have been obvious to a reasonable longshore worker, and that Davis had no actual knowledge of it, then the fault would rest entirely with Portline. If the jury finds instead that Portline was negligent but either that the hazard would have been obvious to a reasonable longshore worker or that Davis actually knew of it, it should apportion liability between the two parties commensurate with their respective comparative fault. It goes without saying that if Portline was not negligent, the jury cannot hold it liable at all.

### E. The Matter of the Standard of Care of a Longshore Worker

We have deliberately phrased the elements of the active operations duty and the definition of obviousness in terms of a reasonable vessel and reasonable longshore worker. At the apportionment stage we think that the same reasonable longshore worker standard applies—that is, when measuring the longshore worker's comparative fault, the worker's negligence is adjudged from the standpoint of a reasonable longshore worker under the circumstances.

When a vessel invites a stevedore aboard, it may reasonably presume that each longshore worker employed by the stevedore boarding the ship has not only the attributes of a reasonable person, but possesses in addition the *minimum* qualifications, skills, knowledge, judgment, care, prudence, and other pertinent traits ordinarily possessed by longshore workers in that or a similar community. *See* KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 32, at 187. We employ the term "minimum" (rather than the term "average") because the standard should not convert half of all longshore workers into negligent practitioners of the art, *see, e.g., Hall v. Hilbun,* 466 So.2d 856, 871 (Miss.1985) (en banc), and because the ship has a duty to prevent injuring all longshore workers who possess the mandatory qualifications, etc., to merit the title of "longshore worker," not just superior ones.

That is not to say that the vessel is precluded from seeking to prove that, because of a particular longshore worker's expertise, he

or she was at fault when an ordinary longshore worker would not have been, or was more at fault than an ordinary longshore worker would have been. What the vessel would have to prove is that the longshore worker *in fact* had this special knowledge or skill, and that an *otherwise reasonable* longshore worker in possession of that knowledge or skill should have acted differently and avoided or mitigated his or her injuries. If the vessel meets that burden, then the longshore worker would not be able to respond that his or her special knowledge or skill is irrelevant because a minimally qualified longshore worker is not required to possess it. That much is a given. *See* REST.2D TORTS § 289 & cmt. *m; id.* § 290 cmt. *f;* KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 32, at 185. We only hold that with respect to a vessel's active operations duty a longshore worker is not held to be an experienced, expert longshore worker as a matter of law, regardless of his or her actual qualifications, etc. We have often referred herein to the longshore worker's actual knowledge as bearing on his or her comparative fault, and although it is irrelevant to the vessel's standard of care in the first instance it is equally applicable to the obviousness inquiry. In short, a qualification, etc., is relevant to the longshore worker's standard of care, whether all qualified longshore workers possess it or whether the injured worker acquires it only by virtue of his or her superior abilities.

On the other hand, it may be that with respect to some injuries the special qualifications, etc., required of a longshore worker are irrelevant to the vessel's or the longshore worker's standard of care. For example, it may not be—we do not mean to advise whether it is or is not—part of the requisite qualifications or skills of a longshore worker in that or a similar community to negotiate decks spotted with ice. In such events, one could substitute "reasonable person" for "reasonable longshore worker" and "person" for "longshore worker" in the elements of the vessel's active operations duty, in the definition of what is obvious, and in the standard of care applicable when measuring the injured worker's comparative fault. One need

not do so, however, because we have defined a "reasonable longshore worker" such that the stated proper result flows logically therefrom.

In the preceding section we adverted to Portline's contention that, as an experienced and expert longshore worker, Davis should have been able to avoid the hazard posed by the ice. By now it should be clear that we do not concur that whether the hazard would have been obvious to or avoidable by an *experienced* longshore worker is the proper query under any stage of the active operations duty analysis. Rather, we reiterate that the proper inquiry is whether the injured worker actually knew of the hazard, or whether a *reasonable* longshore worker (are possessing the minimum qualifications, etc., ordinarily possessed by one employed in the profession in the same or a similar community) would have observed and appreciated it. *See Scindia,* 451 U.S. at 165 n. 13, 101 S.Ct. at 1621 n. 13; *supra* at 543–44 (defining obviousness).

*Scindia* does not require us to treat longshore workers as experts and experienced for purposes of the active operations duty. The Supreme Court's reference to an "experienced stevedore" in *Scindia* was premised on the 1972 amendments to the Act eliminating the vessel's theretofore strict liability to longshore workers for injuries they sustained on account of the stevedore's negligence in its cargo operations, not the vessel's negligence in its active operations. Specifically, *Scindia* articulated that Congress amended § 5(b) of the Act in 1972 "to eliminate the vessel's liability without fault" by confining a vessel's liability to its own negligence " 'rather than the [theretofore controlling] no-fault concept of seaworthiness.' " *Derr,* 835 F.2d at 492 (quoting H.R.REP. No. 1441, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703). Our holdings with respect to the active operations duty comport with that mandate completely.

### F. *The Legal and Legislative History of the Act*

Before concluding, it will be valuable to demonstrate how the standards we have set forth interact with the other *Scindia* duties to implement the workers' compensation scheme Congress intended to erect with the Act. The confounding problem Congress confronted regarding liability to longshore workers suffering work-related injuries in

their perilous trade was to apportion liability between the stevedore/employer and the vessel/contractor. Congress intended the 1927 Act (before the 1972 amendments) to institute a workers' compensation scheme, with its attendant advantages and disadvantages, *see Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 140–41, 76 S.Ct. 232, 240–41, 100 L.Ed. 133 (1956) (Black, J., concurring), for longshore and other harbor workers, but Congress apparently gave little thought to the fact that longshore workers " 'regularly work on premises (i.e., ships) owned by third parties (shipowners) which are temporarily relinquished to the employers (master stevedores).' " *Hurst*, 554 F.2d at 1242 (quoting Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 6–46, at 410 (2d ed. 1975)).

The implications of Congress' oversight were soon felt when the Supreme Court largely undermined the Act's scheme with three decisions: In *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 100–04, 64 S.Ct. 455, 458–60, 88 L.Ed. 561 (1944), the Supreme Court "expanded the seaman's claim against the shipowner based on the warranty of seaworthiness into a broad species of tort liability without fault," *Hurst*, 554 F.2d at 1242; in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 99, 66 S.Ct. 872, 879–80, 90 L.Ed. 1099, *reh'g denied*, 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646 (1946), the Supreme Court applied the expanded warranty of seaworthiness to (many) longshore workers; and in *Alaska S.S. Co. v. Petterson*, 347 U.S. 396, 401, 74 S.Ct. 601, 604, 98 L.Ed. 798, *reh'g denied*, 347 U.S. 994, 74 S.Ct. 848, 98 L.Ed. 1127 (1954), the Supreme Court extended liability to encompass injuries sustained by a longshore worker on account of his or her employer's (the stevedore's) negligence. To ameliorate the great financial burden these decisions imposed on the shipping industry, the Court in *Ryan Stevedoring Co.*, 350 U.S. at 133–34, 76 S.Ct. at 237–38, recognized a stevedore's implied warranty to perform its contract in a safe manner, a warranty entailing an agreement to indemnify the shipowner for liability it incurred by reason of the stevedore's negligent performance.

Another feature of the pre–1972 legal schema was that the employee could bring an action against the vessel although he or she had already recovered the statutory workers' compensation benefits, as a recovery under the workers' compensation portion of the Act did not bar an action against the vessel. *See Derr*, 835 F.2d at 492. To rectify the worker's double recovery, the stevedore's compensation carrier could demand reimbursement of the compensation benefits from the worker. *See Kakavas v. Flota Oceanica Brasileira, S.A.*, 789 F.2d 112, 117 (2d Cir.) (Friendly, J.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). Now the triangle was complete: the end result of these decisions "entirely thwarted" the purposes behind the Act. Under this "anomalous and intolerable situation," *Kakavas*, 789 F.2d at 117, attorneys' fees aside, longshore workers could circuitously obtain full tort remedies against their employers and their employer's compensation carriers would get away scot-free (presumably lowering the stevedore's premiums). *Hurst*, 554 F.2d at 1243; *Kakavas*, 789 F.2d at 117; *see Ryan Stevedoring Co.*, 350 U.S. at 139–41, 76 S.Ct. at 240–41 (Black, J., dissenting); H.R.Rep. No. 1441, 92d Cong., 2d Sess. 1, 4–5 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4699, 4702; S.Rep. No. 1125, 92d Cong., 2d Sess. 4, 8–9 (1972).

Congress intended the 1972 amendments to cure these incongruities which beset the compensation scheme under the Act:

> Under amended section 905(b), the roundabout evasion of the Act's exclusivity provision was ended. The suit based on unseaworthiness was abolished, and an injured longshoremen is now remitted to an action against the third party (i.e., shipowner) only for negligence; the employer (i.e., stevedore) shall not be directly or indirectly liable over to the shipowner if negligence is established. Thus, the shipowner will no longer bear the great burden of broad, no-fault liability via the warranty of seaworthiness, and the stevedore is insulated from double liability. The administrative remedies provided by the Act will once again be the longshoremen's exclusive no-fault remedy, but in turn the Act's benefits and its coverage were greatly expanded.

*Hurst*, 554 F.2d at 1243–44 (footnote and citations omitted); *see Kakavas*, 789 F.2d at

117. Congress did not delineate its understanding of negligence under the Act, however, leaving it to the courts to resolve the issues " 'through the application of accepted principles of tort law and the ordinary process of litigation.' " *Id.* (quoting H.R.REP. No. 1441 at 7, *reprinted in* 1972 U.S.C.C.A.N. at 4704).

Congress also intended to provide incentives for stevedores to avoid exposing longshore workers to unreasonable risks of injury. *See* H.R.REP. No. 1441 at 1, *reprinted in* 1972 U.S.C.C.A.N. at 4699; H.REP. No. 1125 at 2. Congress recognized that the policy of encouraging the stevedore to take reasonable precautions to avoid injury to longshore workers would be frustrated if, under § 33 of the Act, 33 U.S.C.A. § 933 (1986), the stevedore could recover the full amount of the statutory compensation benefits it owes its workers. Section 33 entitles the stevedore to full subrogation of its workers' compensation award obligation whenever the vessel is liable to the longshore worker for the worker's injury. *See Scindia,* 451 U.S. at 181 n. 2, 101 S.Ct. at 1629 n. 2 (Powell, J., concurring). Hence if the longshore worker could recover damages from the third party vessel even if the stevedore was primarily at fault, the stevedore would lack sufficient financial incentives to ensure a safe workplace.

 In recognition of Congress' express purpose to preclude these externalities and to implement an actual workers' compensation system (instead of the caricature of one extant before the 1972 amendments), the Supreme Court in *Scindia* pronounced the limited duties the vessel owes longshore workers in stevedoring situations where *both* entities are involved but where the vessel's involvement is entirely passive (as owner of the ship and contractor for the stevedore's services) and the stevedore's expertise is at play. A vessel breaches its limited duties when its involvement is passive only when, taking due account of the stevedore's primary role in safely conducting *stevedoring* operations, the vessel's negligence injures the longshore worker. That is, during stevedoring operations, the vessel properly relies

on the experience and expertise of the stevedore to load or unload cargo safely, for this experience and expertise is the precise reason why a vessel hires the stevedore, and hence it must not supervise the stevedore. *Cf. Scindia,* 451 U.S. at 171–72, 101 S.Ct. at 1624. The vessel, then, may generally assume that the stevedore is an expert and safety-conscious, correspondingly reducing the vessel's duties toward longshore workers. Should the stevedore fail to live up to its responsibility to protect its workers during stevedoring operations, the Act's compensation scheme forces it to pay the price.

When, however, the hazard occurs due to the vessel's active operations, as is plausibly the case here, it no longer is proper for the vessel to defer to the stevedore's expertise in handling cargo. The problem of apportioning responsibility between the vessel and stevedore by manipulating the vessel's standard of care to account for both entities disappears, because the vessel is in such events responsible for the injury, and liability, if any, should attach to it according to its comparative fault. It patently is not the stevedore's responsibility to protect the worker against the vessel's active operations. That, quite simply, is the vessel's duty. Congress was not ambiguous when it repeatedly pronounced that a vessel's liability should be premised on its own negligence as garnered from land-based third party tort doctrines.[10] In short, unlike with the turnover duty, which generally applies to hidden defects in cargo areas, the vessel cannot rely on the stevedore's expertise to protect its workers from the vessel's active operations. This much we believe the Court recognized in *Scindia,* and the corresponding duty it enumerated (but did not develop) for these situations is the active operations duty.

There is, moreover, no justification for why the stevedore should through the mechanism of the workers' compensation scheme bear the cost of an injury wrought by the vessel's negligence in an area over which the vessel exercised substantial control. We believe additionally that the vessel's liability is efficacious in these circumstances, because it furnishes the vessel with the financial incentive

---

10. *See, e.g.,* H.R.REP. No. 1441 at 4, 6, 7, *reprinted in* 1972 U.S.C.C.A.N. at 4702, 4703, 4704; S.REP. No. 1125 at 8, 10, 11; 118 CONG.REC. 36,273 (1972) (prepared statement of Sen. Williams).

to provide a safe work environment to mitigate the exceedingly perilous conditions under which longshore workers labor. *See* H.R.REP. No. 1441 at 6 ("Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work."), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704; S.REP. No. 1125 at 10 (same); 118 CONG.REC. 36,273 (1972) (prepared statement of Sen. Williams) (same); *see also* S.REP. No. 1125 at 2 ("Longshoring ... has an injury frequency rate which is well over four times the average for manufacturing operations."); 118 CONG.REC. 36,388 (1972) (remarks of Rep. Ashley) (referring to longshoring work as "singularly dangerous").

## V. CONCLUSION

We believe that the framework we have outlined best effectuates Congress' design behind its enactment of the 1972 amendments and stays true to *Scindia*'s interpretation of the Act. The duties and standards of care we have developed under the active operations duty are, we believe, in harmony with the vessel's other duties, and are precisely tuned to the congressional intent: they hold the vessel liable only for its own, not the stevedore's or the longshore worker's, negligence, and, moreover, hold the vessel liable whenever it is negligent.

In view of the foregoing, we conclude that the district court erred in granting summary judgment to Portline with regard to its alleged breach of its active operations duty. We will therefore reverse the district court's grant of summary judgment in part (affirming it in other respects) and remand the case to the district court for further proceedings consistent with this opinion.

SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC

March 28, 1994

The petition for rehearing filed by Appellee having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.