Lawrence A. SARAUW, Appellant in No. 79–2077,

v.

OCEANIC NAVIGATION CORPORATION and VLCC Andreas Atlas,

Oceanic Navigation Corporation and VLCC Andros Atlas, Cross-Appellants in No. 79–2076.

Nos. 79–2076, 79–2077.

United States Court of Appeals, Third Circuit.

Argued April 22, 1980.

Decided May 20, 1980.

---

7. In fact, "[m]erely negligent conduct is never deemed 'willful.'" *Wehr v. Burroughs Corp.,* *supra* at 282. (3d Cir. 1980).

**1170**

Robert B. White, Jr. (argued), Rawle & Henderson, Philadelphia, Pa., for appellants in No. 79–2076 and appellees in No. 79–2077; John F. James, James & Resnick, Christiansted, St. Croix, U. S. Virgin Islands, of counsel.

Joseph L. Costello (argued), Christiansted, St. Croix, U. S. Virgin Islands, for appellee in No. 79–2076 and appellant in No. 79–2077.

Before ADAMS, MARIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Lawrence A. Sarauw, an employee of Hess Oil Virgin Islands Corporation (Hess), commenced this action in the District Court of the Virgin Islands against Oceanic Navigation Corporation (Oceanic), the owner of the vessel VLCC ANDROS ATLAS, pursuant to § 18(a) of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (1972 Amendments), 33 U.S.C. § 905(b).[1] Sarauw sought damages for injuries sustained on November 15, 1977, allegedly as a result of the negligence of Oceanic and Hess, when the gangway to the ANDROS ATLAS fell while he was ascending it.

Following a four day trial, the case was submitted to the jury on special interrogatories. In answering these interrogatories the jury found (1) that Oceanic was negligent and its negligence was the proximate cause of Sarauw's injuries; (2) that Sarauw himself was negligent and was 25% at fault; (3) that Hess, the stevedore-employer, was negligent and its percentage of fault was 25%; and (4) that Sarauw's total damages were $190,800.00.[2] Judgment was entered for Sarauw, but the court reduced the damage calculation by 25% for Sarauw's negligence,[3] and by another 25% for the negligence of Hess.

Both parties appealed. Sarauw claims that the 25% reduction because of the negligence of Hess is error. Oceanic contends that it was error to deny its post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Oceanic asserts in support of its appeal from the denial of its motion for judgment

---

1. That section provides:

   In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

2. These damages were also submitted on special interrogatories, and the jury found as follows:

   | $ 7,000.00 | Medical Expenses |
   |---|---|
   | 8,800.00 | Lost Income — Past |
   | - 0 - | Lost Income — Future |
   | 100,000.00 | Pain and Suffering |
   | 25,000.00 | Loss of Enjoyment of Life |
   | 50,000.00 | Permanent Disability/Disfigurement |
   | $190,800.00 | Total Damages |

3. The trial judge and the parties refer to this reduction as being for "contributory" negligence, but that term was not used in the interrogatories and it is clear that "comparative" negligence was meant. Sarauw does not challenge this reduction for negligence attributed to his own fault. Cf. *Rich v. United States Lines, Inc.*, 596 F.2d 541, 565 & nn.32–33 (3d Cir. 1979) (Garth, J., concurring) (suggesting applicability of comparative negligence doctrine); H.R.Rep.No.92–1441, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4705 ([T]he Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employer's own negligence may have contributed to causing the injury.")

n. o. v. that no duty of care was owed by it to Sarauw to provide a safe gangway and that, even assuming such a duty, there was insufficient evidence to establish a breach of that duty. In support of the appeal from the denial of the new trial motion, Oceanic contends that the trial court incorrectly instructed the jury on the duty of care, and that the listing of pain and suffering, disfigurement, and loss of life's pleasures as separate components of damages in the special interrogatories was plain error.

We reject each of Oceanic's contentions and, accordingly, affirm the denial of its post-trial motions. Sarauw's appeal, though, is, as Oceanic concedes, clearly meritorious on the basis of *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), handed down after entry of judgment in this case by the district court. We shall therefore vacate the judgment and remand with instructions to restore that portion of the verdict that was decreased because of Hess's negligence.

## I. FACTS

Sarauw was employed as a dock helper for Hess, which had the responsibility of unloading the ANDROS ATLAS. The vessel had arrived at Hess's No. 3 dock at St. Croix, U. S. Virgin Islands, to discharge a cargo of crude oil. When the vessel first arrived, a small gangway going from the ship to the dock was put in place by Hess personnel. At about 2:30 a. m. on November 15, 1977, Sarauw observed that the tanker had risen in the water to a point where the small gangway had to be replaced with a longer one. While operating the pier-side crane to swing the longer gangway into position, Sarauw observed that a chain railing was in place on the edge of the vessel's deck where he wanted to secure the head of the longer gangway. After failing to attract the attention of anyone aboard the ship, Sarauw descended from the crane and started up the small gangway which had not yet been removed from the ship's side. When he was part of the way up, the small gangway suddenly came loose from the tanker's side; Sarauw and the gangway fell to the dock, and he was seriously injured.

The small gangway, owned by Hess, has a four inch angle iron welded to its underside. The angle iron fits over a lip at the edge of the ship's deck. This interlocking arrangement was designed to prevent the gangway from rolling away as the vessel rises in the water. Additionally, the head of the gangway is equipped with chains and ropes that are tied to stanchions or padeyes on the deck in order to secure the gangway in the event the angle iron interlock becomes dislodged. It was undisputed that the gangway was not, at the time it fell, fastened to any stanchions or padeyes.

## II. OCEANIC'S APPEAL

### A. The Denial of its Motion for Judgment Notwithstanding The Verdict.

#### 1. The Existence of a Duty.

Oceanic maintains that under the controlling principles of vessel liability to longshoremen under the 1972 Amendments, as enunciated in three recent decisions of this Court, it owed no duty to Sarauw as to the safety of the gangway. *See Hurst v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Rich v. United States Lines, Inc.*, 596 F.2d 541 (3d Cir.1979); and *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116 (3d Cir.1979).

In *Hurst*, we concluded that because the 1972 Amendments abolished unseaworthiness as a basis of liability, all species of liability without fault were abolished as well, including the doctrine of nondelegable duties. 554 F.2d at 1246–47. This Court recently observed that *Hurst* and *Rich* "firmly establish" that

> "the vessel has no general duty [under § 905(b)] continually to supervise the activities of the stevedore, to assume responsibility for the stevedore's equipment, or to assume responsibility for dangerous conditions in the vessel created by the stevedore during the course of its operations (at least when the vessel has

no knowledge of the dangerous conditions)."

*Griffith*, 610 F.2d at 124 (quoting *Rich*, 596 F.2d at 560 (Garth, J., concurring)).

From these principles, Oceanic argues that the line of vessel liability has been drawn on the simple basis of determining who owns the equipment involved in the injury. Oceanic likens the ownership of the gangway in this case to the ownership of the crane causing injury in *Hurst*, which we held to be the exclusive responsibility of the stevedore.

A careful examination of the three principal cases cited by Oceanic reveals that our linedrawing has not been so simplistic. It was not ownership of the crane, but the degree of control over its operation, that was determinative in *Hurst*. *See* 544 F.2d at 1251–52. Retained control was also the critical factual issue in *Rich*. *See* 596 F.2d at 550. As explained in *Griffith*, the evidence in *Rich* "showed '*beyond a doubt*' that the stevedoring company, rather than the vessel, was '*in complete charge* of the details of handling of the containers [on which the injury occurred].'" *Griffith*, 610 F.2d at 124 (quoting, with emphasis added, *Rich*, 596 F.2d at 557).

■ In *Hurst*, some cables slipped off a hook at the end of a crane, operating without a safety catch, while the crane was being used to hoist cargo from the ship's hold. The crane from which the hook was appended was land-based and was the means by which the ship was unloaded. Unloading the ship was the primary function of the stevedore, and the crane was an integral part of that operation over which the vessel owner had no control. In contrast, the gangway here was not in the exclusive control of the stevedore. Here, although the stevedore owned the gangway, the vessel owner did not surrender control over the manner in which the gangway was to be secured. Since the ship customarily retains that control, to posit a duty on the basis of it does not amount to reimposition of strict liability and the warranty of seaworthiness.[4]

As the trial judge concluded, sufficient evidence was adduced in this case to

> establish a duty on the part of the shipowner and crew to secure and maintain the gangway. Plaintiff's expert, Captain David James, testified that good seamanship requires that the ship officers and crew make certain that the gangway is safely and firmly secured at all times and that a watch be posted in the gangway area as an additional safety precaution. Captain James' testimony as to the duty of the crew of the vessel to secure and maintain the gangway equipment was corroborated by statements to the same effect by the ship's captain and second officer, Captain Thalissimos.

■ The verdict thus did not rest on an impermissible theory of unseaworthiness or

---

4. Prior to the 1972 Amendments, courts had established a vessel's absolute duty of care with regard to the gangway because, as part of the vessel, it was covered in the warranty of seaworthiness. *See e.g.*, *Russell v. City Ice & Fuel Co.*, 539 F.2d 1318, 1320 n.2 (4th Cir.1976) (citing cases); *Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866, 869 (1st Cir.1974) (decided before 1972 amendments were applicable). The abolition of the strict liability concept of seaworthiness, however, does not necessarily import the elimination of any duty with respect to the gangway. *Reyes* explicitly recognized a claim of negligence against the vessel independent of the warranty of seaworthiness:

> Because the means of ingress or egress, by whomever furnished, are an "appurtenance" of the vessel, the owner has a duty of care regarding them. The owner is thus liable for a negligent failure to inspect a gangway and

to warn against defects reasonably apparent from inspection or to take steps to repair or replace it. . . . We hold, therefore, that Romero Reyes was entitled to take his case to the jury on the issues of both unseaworthiness and negligence.

494 F.2d at 870. The Court of Appeals for the Ninth Circuit recently noted that "[u]nder the former law, some unsafe conditions which supported an unseaworthiness action might also have supported a negligence action." *Santos v. Scindia Steam Navigation Co.*, 598 F.2d 480, 485 (9th Cir.1979). The congressional committees therefore took care in their reports to head off the fear that the "abolition of the unseaworthiness action might lead some post-Amendment courts to conclude that if a set of facts would have amounted to unseaworthiness, Congress meant to preclude a recovery based on negligence." *Id.*

*respondeat superior*, but on a theory of the vessel's negligence in performing a duty separate from any duty owed by the stevedore. The statute recognizes that a ship may be held liable when it and the stevedore are concurrently negligent. Indeed, "holding the vessel accountable for its negligence, even though the stevedore has been negligent as well, is necessary to effectuate the congressional design of creating an incentive for the vessel 'to exercise the same care as a landbased person in providing a safe place to work.'" *Rich*, 596 F.2d at 560 (Garth, J., concurring); *see Griffith*, 610 F.2d at 124–25; *Santos v. Scindia Steam Navigation Co.*, 598 F.2d 480, 488–89 (9th Cir.1979). The standard by which Oceanic is to be judged is of "reasonable care under the circumstances," which

> would permit a finding of negligence upon a showing: (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury; (2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

*Griffith*, 610 F.2d at 126.

■ We conclude that Oceanic had a duty of care with respect to the gangway appurtenant to its vessel, notwithstanding that the gangway was owned by the stevedore. Neither the 1972 Amendments nor our previous decisions in *Hurst*, *Rich*, and *Griffith* are to the contrary.

#### 2. *The Breach of the Duty.*

■ Oceanic claims that there was insufficient evidence to establish a breach of its duty to maintain the gangway in a safe and secure manner. It argues that the evidence shows that the gangway was secured when it was initially emplaced at about 7:30 p. m., that the gangway was unsecured when it fell with Sarauw aboard at about 2:30 a. m. the following day, and that there was no evidence as to exactly when the gangway became unsecured. Therefore, contends Oceanic, the jury was left to speculate as to the breach because there was no evidence as to when the gangway became untied that would support a finding of Oceanic's actual or constructive knowledge of the dangerous condition of the gangway.

Our scope of review of a jury verdict is, of course, quite limited. "[W]e must view the evidence," and the inferences to be drawn therefrom, "in the light most favorable to the party which obtained the verdict below." *Herman v. Hess Oil V. I. Corp.*, 524 F.2d 767 (3d Cir.1975). With this limitation in mind, we note that Oceanic's analysis overlooks another ground upon which the jury could have found a breach of the duty to maintain a safe and secure gangway.

Sarauw's expert, Captain James, testified that the officer in charge of the ship was responsible for seeing that the gangway was properly secured and that a gangway watch would be the customary method of fulfilling this responsibility. A gangway watch is a competent, sober, and reliable seaman positioned at the head of the gangway to relay communications to the shore and to check that the gangway is secured at all times. Second Officer Thalissimos of the ANDROS ATLAS confirmed that neither of the two seamen in charge of the night watch were in the immediate vicinity of the gangway at the time of the accident. Since the accident occurred because the gangway was unsecured, it would have been reasonable for the jury to conclude that the gangway watch could have alerted Sarauw of the dangerous condition of the gangway had the watch been properly in place. Moreover, there was no evidence that the gangway lashings broke loose; the evidence is that they simply were not attached at all. Had the gangway watch fulfilled its responsibilities, it should have been aware that the ropes and chains were not tied down. There was therefore ample evidence upon which the jury could reason-

ably have found a breach of the duty as to the safety of the gangway.

Because Oceanic's duty of reasonable care included responsibility for the safety of the gangway and because there was evidence to support the finding that Oceanic had breached that duty, we conclude that the trial court did not err in denying Oceanic's motion for judgment n.o.v.

*B. The Denial of its Motion for a New Trial.*

1. *The Jury Instructions.*

Oceanic argues that the trial court should have granted a new trial because its instructions on the standard of care based on the Restatement (Second) of Torts §§ 343 and 343A [5] were erroneous.[6] In *Hurst* we indicated that those sections were inapplicable to a longshoreman's case insofar as they could be interpreted to create a duty of the shipowner to oversee and be responsible for activities of a stevedore within the latter's exclusive control. *See Hurst*, 554 F.2d at 1249 n.35. Such extensive responsibility, we said, would "saddle the shipowner with precisely the sort of nondelegable duty that

Congress sought to eliminate." *Id.*; *see Rich*, 596 F.2d at 551.

Shortly after the trial court denied the motion for a new trial, this Court's opinion in *Griffith* was filed. In that case we held that in some respects §§ 343 and 343A were inapplicable because they were too favorable to the shipowner. We stated that those provisions do not "define for all cases the appropriate standard of care under § 905(b)," because they "would apparently relieve a vessel owner of all liability for an unreasonably dangerous condition on board ship if the invitee longshoreman has failed to exercise ordinary care in dealing with that danger, on the theory that a negligent invitee has assumed the risk of injury. . . . [T]hat principle is inconsistent with the clearly stated intention of Congress to abolish the doctrines of contributory negligence and assumption of risk" in these cases. 610 F.2d at 125. *Accord, Santos v. Scindia Steam Navigation Co*, 598 F.2d 480, 486–87 (9th Cir.1979).

■ In the circumstances of this case, we conclude that any error in using instructions based on §§ 343 and 343A would not

5. These sections read as follows:

§ 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

  (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

  (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

  (c) fails to exercise reasonable care to protect *them against the danger.*

§ 343A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any *activity or condition on the land whose* danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of

importance indicating that the harm should be anticipated.

6. The trial judge's instruction paraphrasing § 343 was as follows:

A vessel owner is subject to liability for physical harm caused to his invitees caused by a condition on the vessel if, but only if, the vessel owner knows or by exercise of reasonable care would discover the condition and would realize it embodies an unreasonable risk of harm to the invitees and should expect that the invitee will not discover or realize the danger or will fail to protect himself against it, and the vessel owner fails to exercise reasonable care to protect against that danger, to protect that invitee against that danger.

The trial judge's instruction based on § 343A was as follows:

A vessel owner is not liable to its invitees for physical harm caused to the invitee by any condition of the vessel whose danger *is* known or is obvious to the invitee unless the owner should have anticipated the harm despite such knowledge or obviousness of the danger.

be a basis for reversal, because it would be error in Oceanic's favor. The standard for vessel liability given in the jury instructions in this case was a more qualified one than that enunciated in *Griffith* of " 'reasonable care under the circumstances.' " 610 F.2d at 125.

#### 2. *The Damage Interrogatories.*

■ Oceanic argues that it was error to submit to the jury damage interrogatories that allowed the jury to assess as separate components pain and suffering, loss of enjoyment of life, and permanent disability. Separate assessment of disability as a distinct element of damages, Oceanic claims, is duplicative of the other two components, and an award for disability is contrary to the compensatory purpose of damage awards. Because Oceanic not only failed to object at trial to the verdict form, but also specifically agreed to its use, the claim is reviewable by us only if the separate assessment of damages amounts to plain error that "is so fundamental or prejudicial that not to consider it could result in a gross miscarriage of justice." *Thompson v. Burke*, 556 F.2d 231, 236 n.8 (3d Cir.1977).

■ All of the elements of the jury's damage award, however, may be found in §§ 905, 924 of the Restatement (Second) of Torts,[7] which, this Court has noted, is, when consistent with congressional intent, an appropriate guide in developing a uniform federal law of negligence. *Griffith*, 610 F.2d at 126. We need not decide whether or not separate assessment of the components was error, but only conclude that under the Restatement and *Griffith* any

error committed would not be so clear and egregious as to be reviewable.

### III. SARAUW'S APPEAL

■ Sarauw contends that it was error for the trial judge to apply the equitable credit doctrine to reduce the jury verdict by the amount attributed to Hess' negligence.[8] The Supreme Court definitively held in *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), that the equitable credit doctrine was not an intended part of the statutory scheme. Accordingly, the 25% reduction in Sarauw's verdict must be restored.

### IV. CONCLUSION

The portion of the trial court's judgment denying Oceanic's motion for judgment n.o.v. or for a new trial will be affirmed, the portion denying Sarauw's motion will be vacated, and the case remanded with instructions to enter a new judgment restoring the deduction made by the trial judge for Hess's negligence.

---

7. These sections read as follows:
   § 905. Compensatory Damages for Nonpecuniary Harm
   Compensatory damages that may be awarded without proof of pecuniary loss include compensation
   (a) for bodily harm, and
   (b) for emotional distress.
   § 924. Harm to the Person
   One whose interests of personality have been tortiously invaded is entitled to recover damages for past or prospective

   (a) bodily harm and emotional distress;
   (b) loss or impairment of earning capacity;
   (c) reasonable medical and other expenses; and
   (d) harm to property or business caused by the invasion.

8. The rationale of the equitable credit doctrine and the reason for the Supreme Court's rejection of its application in this type of lawsuit are summarized in *Griffith*, 610 F.2d at 121–22.