**James P. HALPIN, Plaintiff,**

**v.**

**ATKINSON–KIEWIT, J.V., Defendant.**

**Civ. A. No. 92–10632–NMG.**

United States District Court,
D. Massachusetts.

April 12, 1995.

Order Denying Reconsideration
April 12, 1995.

David B. Kaplan, The Kaplan Group, Boston, MA, for James P. Halpin.

Thomas E. Clinton, Arthur P. Skarmeas, Clinton & Muzyka, Boston, MA, for Atkinson–Kiewit, J/V.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS (# 30)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff, James P. Halpin, seeks recovery under § 905(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1988) (LHWCA), for injuries sustained on June 13, 1991 during the course of his employment with the defendant as a pile driver/foreman working on the Jamestown Bridge project in Rhode Island. At the conclusion of the plaintiff's case at the nonjury trial,[1] the defendant filed a written motion for judgment on partial findings. The issues have been fully briefed, and the matter is ripe for decision.

### II. THE FACTS

The facts adduced at trial in the light most favorable to the plaintiff[2] are that on June 13, 1991, the plaintiff was assigned to work off a crane barge, designated Barge 852, which had been chartered by the defendant. The barge was located adjacent to a moored

---

1. The parties consented to have the case tried without a jury before the undersigned pursuant to 28 U.S.C. § 636(c).

2. For purposes of determining the merits of Defendant's Motion for Judgment on Partial Findings (# 30), the facts are viewed in the light most favorable to the plaintiff. See Rule 50(a), Fed. R.Civ.P. It is noted that, at least in some respects, the factual recitation by plaintiff as to how the accident occurred differs from the version of the facts elicited by the defendant during

its case-in-chief from Captain Gerald Titus who was operating the Eagle at the time. However, plaintiff had wanted to call him as his witness but the Court suggested that Captain Titus be called by the defendant since the plaintiff did not list Captain Titus on his witness list. The plaintiff agreed to let the defendant call Captain Titus. (Tr. 166–7) In these circumstances, I shall judge all the evidence in the light most favorable to the plaintiff.

supply barge to which it was tied. The supply barge was adjacent to an unfinished granite pier which was in the process of being constructed and which was to be used to support the bridge. As of June 13th, the blocks or panels of the pier were in place but had not yet been secured and the concrete had not been poured. A sixty-foot steel gangplank/catwalk ("catwalk") spanned the distance over water between the supply barge and the pier. The catwalk provided the only means for the workers to move between the concrete pier and the supply barge. The gangway was secured to the supply barge by a "come along," which is a steel wire with hooks.

The defendant operated the M/V Narragansett Eagle, ("the Eagle") to transport men and cargo from the shore to the barges. On June 13th, the Eagle was approaching the area in order to deliver grout to the supply barge. At the time the wind was blowing at 35 knots and the seas were very rough and choppy. (Tr. 25). The Eagle came into the area on the windward side. The Eagle's nose/bow was against the supply barge, and the stern of the vessel was next to the pier. (Tr. 99). The bow was tied off to one end of the supply barge. (Tr. 50). In order to maintain the Eagle's bow against the supply barge, Captain Titus had to continue the Eagle's engine engaged in a forward direction. (Tr. 90). This caused the supply barge and Barge 852 to move, which, in turn, caused the "come along" steel wire which held the catwalk to the supply barge to break. As the barges moved away from the pier as a result of the forward motion of the Eagle, the end of the catwalk which had been attached to the supply barge dropped into the water. (Tr. 91, 98). The catwalk then became wedged against the supply barge just below the water line; the other end continued to be held in place at the pier by angle irons. (Tr. 34).

At this point, plaintiff had several concerns. First, he feared for his own safety and the safety of his men because the stern of the Eagle was "slamming against" the granite panels and since the panels were not secured, they could fall into the pier on top of the men. (Tr. 33). Second, he was concerned that the end of the catwalk under water could poke a hole in the supply barge and sink it. (Tr. 36). He decided that he had to get the catwalk out of the water and back on the supply barge and get the men off of the pier.

Plaintiff decided to use the crane which was secured to Barge 852 to lift the catwalk out of the water and reposition it on the supply barge. At plaintiff's direction, one of his men attached the eye of a "spreader hook" (steel cable with eye in the middle and hooks on each side) on top of the hook from the headache ball of the crane. The crane operator then moved the headache, spreader and choke over to the plaintiff on the pier. The plaintiff gave one hook to a worker, Mark Nealand, who was standing on the pier. The plaintiff took the choke and other hook, and, using another piece of the steel eye, made a loop. He put his foot into the loop and held onto the headache ball of the crane with both hands. The crane operator then lifted him over to the water above the catwalk and then lowered him down to the area where the catwalk was in the water. (Tr. 36–7). Plaintiff then tried to hook the catwalk so that it could be lifted by the crane. He made several attempts but was unable to hook the submerged gangway because of the wind and tide conditions and because the Eagle was creating such a big wake/backwash. (Tr. 38).

Plaintiff came to believe that he could not safely complete the job, so he signaled the crane operator to lift him up to the deck of the supply barge. While he was being raised up on the ball, the other end of the spreader hook, which was still being held by the fellow worker Mark Nealand on the pier, was pulled out of Mr. Nealand's grasp. This caused the hook to swing out and to strike plaintiff in the side of his face seriously injuring him. (Tr. 38).

At this point, the Eagle was stuck. Another vessel, the "Go–Between" had to be called out to the site to pull the Eagle from its stuck position, wedged between the granite panels and the supply barge. (Tr. 102).

### III. THE PROCEEDINGS TO DATE

Plaintiff commenced this action on March 13, 1992 seeking recovery for alleged negligence under the Jones Act (Count I), unseaworthiness under general maritime law (Count II), an award for maintenance and cure (Count III), negligence under the LHWCA, 33 U.S.C. § 905(b) [3] (Count IV), and negligence under general maritime law (Count V). Prior to trial, however, plaintiff agreed to dismiss all counts except for the claim under the LHWCA (Count IV). (*See* # 20, ¶ II.a.)

Counsel agreed that the trial would be bifurcated with the issue of liability being tried first. (*See* # 28) The parties also stipulated that, for purposes of § 905(b) of the LHWCA, the Eagle and Barge 852 were "vessels", that the defendant "owned the vessel" [sic] and that plaintiff was a "maritime worker". (*See* # 20) The trial commenced. The plaintiff presented his case; the defendant called Captain Titus, and the plaintiff called Joe Voccola as a rebuttal witness to Captain Titus' testimony. The Court then suspended the trial pending a ruling on defendant's motion for judgment on partial findings.[4]

### IV. A DISPUTE OVER THE PLEADINGS—DOES COUNT IV ALLEGE NEGLIGENCE IN CONNECTION WITH THE OPERATION OF THE EAGLE?

The first issue presented by the defendant's motion is whether Count IV of plaintiff's complaint can fairly be said to allege negligence not only as to Barge 852 but also as to the Eagle. Defendant argues that Count IV is against Barge 852 only. Count IV reads as follows:

#### COUNT IV
(Negligence/33 U.S.C. § 905(b))

16. Paragraph 1–15 are realleged and incorporated herein.

17. The injuries sustained by the plaintiff were due to no fault of his, but were caused by the negligence of the operators of the Barge 852.

18. As a result of said injuries, plaintiff has suffered great pain of body and anguish of mind, incurred medical and hospital expenses, lost a great deal of time from his usual work, and has suffered and will suffer other damages as will be shown at the trial, all in the sum of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS.

19. This cause of action is brought based upon negligence pursuant to 33 U.S.C. § 905(b).

WHEREFORE, the plaintiff demands judgment against the defendant in the sum of FIVE HUNDRED THOUSAND ($500,-000.00) DOLLARS, together with interest and costs.

Defendant contends that the evidence presented at trial only related to the negligence of the Eagle and not that of Barge 852. However, defendant argues that Count IV does not allege negligence of the Eagle but only of Barge 852. Thus, defendant claims that it is entitled to judgment as a matter of law on Count IV.

Plaintiff, however, points out that Count IV incorporates by reference all previous paragraphs of the complaint and that prior paragraphs allege the negligence of both Barge 852 and the Eagle. After sections entitled "Introduction" and "Jurisdiction," the numbered paragraphs of the complaint begin. The first four are under the heading "The Parties." Paragraph 5 is under the heading "Factual Allegations" which reads:

5. On or about June 13, 1991, the plaintiff was in the employ of the defendant as a maritime worker, and member of the crew of the BARGE 852 and while in the exer-

---

3. Section 905(b) provides, in relevant part:

In the event of injury to a person covered under this Act caused by the negligence of a vessel ... such person ... may bring an action against such vessel as a third party ..."
33 U.S.C. § 905(b).

4. Defendant's counsel stated that he had two other witnesses who the defendant would have to arrange to have fly from Las Vegas, Nevada to Boston. The Court suggested, and counsel agreed, that defendant's motion would be determined before those witnesses need be brought to Boston.

cise of due care and in the performance of his duties, he sustained severe and painful personal injuries due to the negligence of the operators of the BARGE 852 and/or unseaworthiness of the said BARGE 852. **In addition, these injuries also resulted from the negligence of the operators of the NARRAGANSET (sic) EAGLE.**

Emphasis supplied.

The complaint then continues with Count I, the first paragraph of which is numbered "6." Consequently, plaintiff argues that the defendant had "fair notice" that his claim under the LHWCA was based, in part, upon the alleged negligence of the operators of the Eagle. Even if the complaint is found not to state a claim under the LHWCA on the basis of the negligence of the operators of the Eagle, plaintiff argues that, in all the circumstances, he should be permitted to amend the complaint to conform to the evidence pursuant to Rule 15(b), Fed.R.Civ.P., since there was no undue delay, bad faith, dilatory motive or prejudice to the opposing party.

■ The Court finds Count IV of the complaint to be ambiguous. The ambiguity probably did not matter when Count V, a separate count alleging a cause of action under "General Maritime Law" and "Negligence" explicitly directed at the operators of the Eagle, was also in the case. However, once all counts except Count IV were dismissed by agreement, the only thing which was clear about the Complaint was the glaring ambiguity which arose because Count IV speaks only of "the negligence of the operators of the BARGE 852" but then incorporates all other preceding paragraphs by reference, including paragraph 5 which alleges negligence of both Barge 852 and the Eagle.

■ In my judgment, the proper course is to proceed on the basis that the plaintiff is pursuing a claim under the LHWCA for the asserted negligence of both Barge 852 and the Eagle. Since the pleadings can be read in this manner, I see no need for there to be an amendment to conform to the evidence pursuant to Rule 15(b), Fed.R.Civ.P. However, I am guided by the principles set forth in that rule. I construe the pleadings to allege negligence by the operators of the

Eagle because "... the presentation of the merits of the action will be subserved thereby ..." and the defendant has failed to satisfy me that it has been prejudiced in "maintaining ... [its] ... defense upon the merits." In addition, since this is a non-jury matter, I can fashion a remedy which will cure any disadvantage suffered by the defendant as a result of its proceeding on the basis that the negligence alleged only related to the operators of Barge 852.

I might add that it is unclear that there has been any prejudice to the defendant, or that the defendant has been at any disadvantage. No instances of prejudice are cited either in the defendant's memorandum in support of its motion or during the trial. In his opening statement, plaintiff's counsel made it clear that plaintiff was alleging that the operators of the Eagle were negligent. In his opening statement, defendant's counsel did make clear that it was his view that any negligence of the operators of the Eagle was irrelevant; he conducted his defense as if the allegation was that the operators of both Barge 852 and the Eagle were negligent. He introduced evidence in the form of Captain Titus' testimony to demonstrate that the operators of the Eagle were not negligent. In short, I do not see how counsel for the defendant would have acted differently if there had been no dispute that the negligence of the operators of the Eagle was an issue at trial.

However, in order to be as sure as possible that the defendant has not been prejudiced, when the trial continues, I shall allow the defendant to recall any of the witnesses previously called during the trial for any additional testimony on the issue of whether or not the operators of the Eagle were negligent. But I shall deny defendant's motion to the extent that it seeks judgment as a matter of law on the basis that there is no issue in this case as to the negligence of the operators of the Eagle.

## V. NEGLIGENCE UNDER THE LHWCA—THE APPLICABLE LAW

### A. The Scindia Case and its Progeny

Although defendant's memorandum in support of its motion sets forth arguments as if

there was a dispute as to the applicable law, it is clear from plaintiff's subsequently-filed opposition that this is no longer the case. (*See* # 34 at p. 5) Plaintiff now agrees with the defendant that the "Fleet Doctrine" is a maritime concept developed in the context of seaman status and is not applicable to the present case.[5] Accordingly, plaintiff's counsel's argument at trial that he need not show evidence of negligence of the barge in order to recover if he proves that one or more other vessels were negligent, will not be considered by the Court.

Plaintiff also agrees with the defendant that the vessel owner's duties are those enunciated in *Scindia Steam Navigation Co., Ltd v. De Los Santos, et al.,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) and its progeny. Although plaintiff's counsel at one time took the position that *Scindia* did not apply to the present case,[6] he has apparently abandoned this argument.

Under § 905(b), a longshoreman injured by the negligence of a vessel may bring a third party action against the vessel owner, and the liability is based on negligence, not unseaworthiness. Although the statute does not define negligence, the United States Supreme Court determined that land-based negligence concepts do not govern § 905(b) claims for vessel negligence and specifically delineated the negligence standard applicable to claims brought under § 905(b). *Scindia,* 451 U.S. at 166–168, 101 S.Ct. at 1621–1623. Although *Scindia* arose in the context of an injury to a longshoreman employed by a stevedore to unload a vessel, the statute refers to an "employee" as "... any person engaged in maritime employment ..." with exceptions not here pertinent, and courts have applied the rationale of the *Scindia* case to those who are employed in the maritime industry other than as stevedores. *See, e.g., Lormand v. Superior Oil Co.,* 845 F.2d 536, 541 (5 Cir., 1987), *cert. denied,* 484 U.S. 1031, 108 S.Ct. 739, 98 L.Ed.2d 774 (1988); *Levene v. Pintail Enterprises, Inc.,* 943 F.2d 528, 533 (5 Cir., 1991). *See also Hill v. Texaco, Inc.,* 674 F.2d 447, 452 (5 Cir., 1982);

*Dean v. McKie Co.,* 771 F.Supp. 466, 475 (D.Mass., 1991); *Krzywicki v. Tidewater Equipment Co. Inc.,* 600 F.Supp. 629, 637, fn. 14 (D.Md., 1985).

Under the principles set forth in the *Scindia* case, a vessel owner is answerable for its own negligence and not the negligence of the stevedore or employees of stevedores. The shipowner has no duty to inspect or supervise stevedoring operations, and there is no continuing duty to take reasonable steps to discover and correct any dangerous conditions that arise during the loading or unloading process. However,

the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work ... The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if the negligence causes injury to a longshoreman.... the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in

---

5. *See Lirette v. N.L. Sperry Sun, Inc.,* 831 F.2d 554 (5 Cir., 1987) for a discussion of the doctrine.

6. *See* Tr. 146.

areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Scindia,* 451 U.S. at 166–67, 101 S.Ct. at 1622 (internal citations omitted).

The standard set forth in the *Scindia* case has been stated in the form of five elements by the Ninth Circuit Court of Appeals in the case of *Bjaranson v. Botelho Shipping Corp.,* 873 F.2d 1204 (9 Cir., 1989). The five are: (a) "turnover duty of safe condition"—i.e., "the vessel must '[exercise] ordinary care ... to have the ship and its equipment in such condition that an expert and experienced stevedore will be able ... to carry on cargo operations with reasonable safety ...'"; (b) "turnover duty to warn"—i.e., that "the vessel must [warn] ... of any hazards on the ship or with respect to its equipment" which it knows or should know the stevedore would encounter and would not know or would not be obvious to him; (c) "active involvement duty"—i.e., "the vessel may be liable 'if it actively involves itself in the cargo operations and negligently injures a longshoreman'"; (d) "active control" duty—i.e., that "the vessel may be liable' if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel ...'"; and (e) "duty to intervene"—i.e., the vessel has a duty to intervene in the operations when the vessel is aware of the condition when "the condition presents an unreasonable risk of harm to the longshoremen," and "when the vessel knows that ... as a result of an 'obviously improvident' judgment," the stevedore "failed to remedy the situation." *Bjaranson,* 873 F.2d at 1207 (internal citations and quotations omitted). *See also Keller v. United States,* 38 F.3d 16, 25 (1 Cir., 1994) (applying five tests set forth in the *Bjaranson* case).

B.  *Vessel v. Employer Negligence: Dual Capacity Doctrine*

■ The parties do not dispute that the duties set forth in the *Scindia* case are applicable to a vessel owner even though the

vessel owner is also the employer of the injured employee, as it is in the present case. *Levene,* 943 F.2d at 534. However, the liability of the employer/vessel owner is limited by what is denoted the "dual capacity doctrine." *Id.* Under that doctrine, the negligence of the vessel (as opposed to the negligence of the employer) is limited to those acts taken in connection with the vessel itself and does not extend to accidents which do not result from any defect in the vessel or acts taken in connection with the vessel. As stated by the Fifth Circuit in the *Levene* case:

> When an employer acts in a dual capacity as vessel owner, the entity retains its immunity for acts taken in its capacity as an employer, but may still be sued "qua vessel" for acts of vessel negligence.

*Levene,* 943 F.2d at 531 (citations omitted).

Put yet another way, the vessel owner is not liable for any and all hazards which a longshoreman might encounter in the course of his work, but the vessel owner is liable for injuries caused by hazards under control of the vessel. Typically, "[t]he cases ... which ... have found such control by the vessel owner as to impose a duty generally have dangerous conditions *on* the owned vessel itself." *Levene,* 943 F.2d at 535 (emphasis added). The key factor, however, is the control of the vessel or work area thereon.

## VI.  APPLYING THE LAW TO THE FACTS ADDUCED AT TRIAL

Since there does not appear to be any dispute as to defendant's control of the either Barge 852 or the Eagle, it is clear that the defendant, as the owner and/or operator of those vessels, owed to the plaintiff the duties set forth in the *Scindia* opinion. Thus the crux of the motion centers around the issue whether there was a breach of the duties owed. Applying the law as previously discussed, plaintiff's burden is to offer evidence that the defendant breached a duty with respect to some condition of or on the vessels themselves,[7] and that such breach proximately caused plaintiff's injuries.

---

7. The only possible duties on the present record involve the active involvement duty, active control duty and intervention duty. The so-called

"turnover" duties do not apply here since the defendant maintained control of both Barge 853 and the Eagle at all relevant times.

## A. *Alleged Negligence of Barge 852*

Defendant argues that, even construing the evidence in the light most favorable to the plaintiff, plaintiff has failed to produce any evidence whatsoever to show negligence of Barge 852. Defendant points to the fact that there was no allegation that the crane, or any other piece of equipment or tooling on the barge was defective, or that the operator of the crane was negligent. Plaintiff also did not allege that any dangerous condition existed on Barge 852. Moreover, defendant asserts that plaintiff testified that Barge 852 had nothing to do with the gangway's fall into the water. Defendant contends that plaintiff's evidence of negligence related only to the Eagle. In sum, defendant asserts that the plaintiff has not produced evidence that the defendant breached its duty with respect to Barge 852 and thus, it is entitled to judgment as a matter of law with respect to the § 905(b) claim as to the barge.

■ Additionally, the defendant argues that even if there was proof of a breach of duty with respect to Barge 852, there is absolutely no evidence that the breach of duty proximately caused his injury. It is not sufficient to demonstrate that a vessel is factually connected to the situation in which plaintiff is injured; there must be evidence of a causal connection between the injuries and the breach of duty. *See Woods v. Partenreederei Ms. Yankee Clipper,* 677 F.Supp. 46, 48 (D.Mass.1987); *Dean,* 771 F.Supp. at 476. Here, defendant contends plaintiff has failed to show that nexus.

■ In opposition to defendant's allegations, plaintiff points to the testimony of Captain Titus which he claims demonstrates evidence of negligence of the defendant with respect to Barge 852. Captain Titus' testimony was somewhat confusing, but in the light most favorable to the plaintiff, the testimony was that at the time the Eagle approached the barges, the lines between the barges were too slack, not having been adjusted for the change in tide. He testified that the crews of the barges had a duty to adjust the lines each time the tide turned and that had not been done. As best I can discern Captain Titus' testimony, it was to the effect that Barge 852 was anchored and stationary and the supply barge, which was not anchored, was tied to it. If the lines had not been slack, the supply barge would not have moved the distance it did when the Eagle came up to it, and if the supply barge had not moved the distance it did, the catwalk would not have fallen off. (Tr. 216–21) Although this is the only connection between Barge 852 and the gangway falling, plaintiff contends that this fact is sufficient to show that defendant breached its *Scindia* duty of active involvement (since it was involved in the work), and its active control duty (defendant actively controlled the two barges).

Upon review of the evidence, again in the light most favorable to the plaintiff, I rule that if Captain Titus' testimony were believed and interpreted as plaintiff suggests, the evidence is sufficient to sustain a claim that Barge 852 was negligent in not tightening the lines when the tide changed and that caused the supply barge to move when the Eagle came up to it which in turn caused the catwalk to fall which started the chain of events leading to plaintiff's injuries.

Thus, Defendant's Motion for Partial Judgment on the Pleadings (# 30) will be denied as to the claim against Barge 852.

## B. *Alleged Negligence of the Eagle*

■ Plaintiff has clearly produced sufficient evidence to withstand judgment as a matter of law on Count IV, to the extent that it states a § 905(b) claim against the Eagle. The evidence of negligence put forth by plaintiff is clearly sufficient to demonstrate factual issues exist in this regard.

## VII. ORDER

In accordance with the foregoing, it is ORDERED that Defendant's Motion for Partial Judgment on the Pleadings (# 30) be, and the same hereby is, DENIED. The Court will schedule a conference to set a date for the resumption of the non-jury trial.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION (# 38)

I acknowledge that, in ruling on Defendant's Motion for Judgment on Partial Find-

ings (# 30), I should have acted pursuant to Rule 52(c), Fed.R.Civ.P., rather than Rule 50(a), Fed.R.Civ.P. I also acknowledge that, in proceeding pursuant to Rule 52(c), Fed. R.Civ.P., the evidence is not taken in the light most favorable to the plaintiff.

That said, Rule 52(c), Fed.R.Civ.P., plainly permits the court to decline to render any judgment until the close of all the evidence. Having thoroughly canvassed the evidence and law in preparing the Memorandum and Order on Defendants' Motion for Judgment on Partial Findings, I hereby expressly decline to render any judgment on liability until the close of all the evidence on liability. This declination renders moot defendant's argument that I improperly considered Captain Titus' testimony in ruling on Defendant's Motion for Judgment on Partial Findings (# 30).

Accordingly, it is ORDERED that Defendant's Motion for Reconsideration (# 38) be, and the same hereby is, DENIED. The nonjury trial on liability will continue to conclusion on *April 20, 1995.*