**John REED, Plaintiff,**

v.

**ULS CORPORATION and M/V Gordon C. Leitch, Defendants.**

**No. Civ. 5–96–284/RHK/RLE.**

United States District Court,
D. Minnesota.

March 26, 1998.

Toby Marcovich, Marcovich, Cochrane & Milliken, Superior, Wisconsin, for plaintiff.

William Carle & Robert Coniam, Ray, Robinson, Hanninen & Carle, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiff John Reed ("Reed") works as a longshoreman at the harbor in Duluth, Minnesota. On November 8, 1995, Reed was injured as he was walking down the gangway of the M/V Gordon C. Leitch, a Great Lakes carrier that was moored in the Duluth harbor. Reed then filed suit, alleging a claim for negligence under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). This matter is presently before the Court on the Defendants' Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion.

### Facts

Defendant M/V Gordon C. Leitch (the "Ship") is a Great Lakes bulk carrier that Defendant ULS Corporation ("ULS") owns. (Penney Aff. at 1–2.) On November 8, 1995, at approximately 3:00 a.m., the Ship moored port side to the Peavey Dock in the Duluth harbor, waiting to receive a grain cargo. (*Id.* at 2–3.)

The Ship has two gangways made of heavy aluminum, each with 29 steps and a top and bottom platform. (Penney Aff. at 3.) A threaded hole and axle on each end of the step bolts every step along its centerline to the gangway. (*Id.*) This allows each step to turn along its centerline. (*Id.*) Each step also has unthreaded holes, or ears, at the underside of both back corners. (*Id.*) Each ear is pinned to an angle iron that runs the length of the gangway under each of the steps. (*Id.*) The pins, which are slip fit, are held in place by keeper wires through holes drilled in the ends of the pins. (*Id.*) The pins

are 1½ inches long and 5/6 inch wide and are made out of aluminum, and the brushings that fit on the pins are one inch long. The upper end of each angle iron is hinged to the gangway's top platform, creating a mechanical linkage that changes the angle of the steps to keep them level as the angle of the gangway changes during loading. (*Id.*)

When the gangways are not in use, they are stowed vertically on their sides in a cradle located on the edge of the deck. (Penney Aff. at 3.) In this position, the underside with the mechanical linkage faces away from the deck. (*Id.* at 4.)

After the Ship moored at the Peavey Dock, Phillip Bailey ("Bailey") and Mr. Mackey ("Mackey"), two of the Ship's ordinary seamen, handled the Ship's lines on the dock and then assisted in putting the gangway in place along the port side amidship, securing its handrails and safety net.[1] (Barrett Aff. at 2; Bailey Aff. at 2.) Bailey and Mackey then boarded the Ship using the gangway, checking the condition of the gangway steps as they walked up them. (Bailey Aff. at 2.) They, however, did not look under the gangway for missing pins, bolts, or other abnormalities in the mechanical leveling feature of the steps. (*See id.*) Neither Bailey nor Mackey noticed any problems with the gangway. (*Id.*)

Between 3:00 a.m. and 8:00 a.m., members of the Ship's crew who wished to go ashore used the gangway. No one reported any problems with it. (Penney Aff. at 4.) At 8:00 a.m., Angus MacLeod ("MacLeod"), the port manager for the American Grain Trimmers, and six longshoremen boarded the Ship using the gangway. (MacLeod Aff. at 2.) MacLeod visually inspected the gangway and other areas of the Ship to determine if they were clear and safe for the longshoremen to conduct their work. (*Id.*) MacLeod did not notice any problem with the gangway at this time, and he found it to be in good working condition when he ascended and descended onto and off of the Ship. (*Id.*) Between 8:00 a.m. and 11:50 a.m., the Ship's personnel and

---

1. An electronic winch and cable hoisted the gangway over the side of the Ship and lowered it into place. (Penney Aff. at 4.)

others used the gangway. (Penney Aff. at 4.) No one reported any problems with the gangway during this time. (*Id.*)

At approximately 11:50 a.m., Reed was walking down the gangway when the eighth step from the bottom gave way, causing him to slide down the remainder of the gangway on his back and buttocks. (Bishop Aff. at 2.) Shortly thereafter, John Bishop ("Bishop"), the Ship's third mate, went to the gangway to investigate the accident. (*Id.*) The eighth step from the bottom had collapsed and was hanging in a vertical position. (*Id.*) Bishop examined the step and saw that both pins that attach to the ears on the underside of the step were missing. (*Id.*) These parts were never found. Bishop repaired the step using conventional bolts, nuts, and washers because the Ship did not have replacement parts for the missing pins and bolts. (*Id.* at 2–3.) He also determined, by standing under the gangway, that the remainder of the pins on the ears of the other steps were in place. (*Id.* at 3.)

The parts of the step that were missing are not readily visible. (Parent Aff. at 3.) If a person stands under the deployed gangway and looks up, only the ends of the pins holding the keeper wires and the ears on the lower steps are visible, while the portion of the pins that pass through the ladder framing are not. (*Id.*) A person inspecting the gangway would not be able to see if the pin had broken or weakened in the area that passes through the framing. (*Id.*) When the gangways are in their stowed position on deck, a person, by leaning over the edge of the deck, could see the underside of the steps and the pins on the side of the gangway lying on the Ship's deck. (*Id.*) If both pins that attach to the ears underneath a step had broken, the step would fall to a vertical position. (*Id.* at 4.) The parties agree, however, that a step would remain in its horizontal position if only one pin were in place.

Neither the Ship's captain nor its third mate had ever seen a gangway step fail before Reed's accident. (Penney Aff. at 5; Bishop Aff. at 3.)

## Analysis

### I. Standard of Review

Federal Rule of Civil Procedure 56 states:

[Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the court should draw all justifiable inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514; *see also* Fed.R.Civ.P. 56(e).

### II. Longshoremen's and Harbor Workers' Compensation Act

Reed claims that the Defendants violated the Longshoremen's and Harbor Workers' Compensation Act (the "Act"), 33 U.S.C. § 905(b) (1998), by negligently failing to provide him with a safe place to work and by failing to make inspections of the Ship by

which the defective step upon which he was injured would have been discovered. (Am. Compl.¶ 7.)

■ The Act provides that a longshoreman may recover from a shipowner for injuries caused by the shipowner's negligence. The Act states, in pertinent part: "In event of injury to a person covered under this chapter caused by the negligence of the vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party...." 33 U.S.C. § 905(b). Because Congress did not specify the acts or omissions of the shipowner that would constitute negligence, the contours of a shipowner's duty to longshoremen are left to be resolved through the application of accepted principles of tort law. *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 97, 114 S.Ct. 2057, 2063, 129 L.Ed.2d 78 (1994).

■ In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court outlined a shipowner's duty to longshoremen:

[T]he vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, and that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Id.*, 451 U.S. at 166–67, 101 S.Ct. at 1622. This duty, which is referred to as the "turnover duty," includes the duty to provide safe working conditions to the longshoremen and the duty to warn longshoremen of hidden hazards that the shipowner knows about, or

should know about, in the exercise of reasonable care before turning the ship over to the stevedore for cargo loading. *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir. 1983); *Halpin v. Atkinson–Kiewit, J.V.*, 894 F.Supp. 486, 492 (D.Mass.1995) (collecting cases).

In *Scindia*, the Court also explained the shipowner's "active control" duty:

[T]he vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoremen or fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operations.

*Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. The Court, however, also clarified that a shipowner does not have a duty to supervise the cargo activities of the stevedore.

We are of the view that absent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.

*Id.*, 451 U.S. at 172, 101 S.Ct. at 1624; *see also Helaire*, 709 F.2d at 1038–39 (noting that once loading has begun, "the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger").

■ The Defendants argue that they are entitled to summary judgment because Reed has not presented any evidence that they breached their duty to provide him with safe working conditions or to warn him of defects about which they knew, or reasonably should have known. (Defs.' Mem. in Supp. of Mot. for Summ.J. at 17.) The evidence, they contend, shows that the step was working properly up until the moment that Reed stepped

on it and it collapsed, and that there is no evidence that they should have known of the missing or defective pins that caused the step to collapse. (*Id.* at 18–19.)

The Court finds that Reed has failed to create a genuine issue of material fact on the issue of whether the Defendants breached their duties to provide him with a safe working environment or to warn him of dangers about which they knew, or reasonably should have known. Reed contends that, based upon the record, a reasonable jury could conclude that the Defendants were negligent by failing to adequately inspect the gangway and discover the missing pins. (Pl.'s Mem. in Opp'n to Mot. for Summ.J. at 10.) ("Pl.'s Mem.") Reed argues that the captain, in his monthly inspection of the Ship, could have discovered the missing pins by leaning over the edge of the deck and inspecting the underside of the gangway when it was stored in its cradle, or that the seamen who inspected the gangway after it was first lowered onto the Peavey Dock could have looked underneath the gangway after it was deployed and discovered the missing pins. (*Id.*)

The flaw in Reed's argument, however, is that there is no evidence in the record indicating what caused the pins to fall out—whether they wore away, broke in two, or somehow became loose and fell out—or when this occurred. Moreover, there is no evidence in the record demonstrating how many pins were in place immediately preceding Reed's accident.[2] Instead, the record indicates that the gangway was working properly for several hours on the day Reed was injured and that the step was in the proper, horizontal position until the point that Reed stepped on it and it collapsed. Accordingly, there is no evidence in the record upon which a jury could conclude that any inspection would have discovered the missing pins, if any were missing before his accident. *See Biggs v. Logicon, Inc.,* 663 F.2d 52, 54 (8th Cir.1981) (noting, in claim for negligence brought under the Act, that the court properly found in favor of the defendant when the "plaintiff presented no evidence that an inspection would have disclosed the defect" that caused the plaintiff's injuries); *see also Mayer v. Lykes Bros. S.S. Co., Inc.,* 585 F.Supp. 1222, 1227 (E.D.La.1984) (holding that shipowner was not negligent under the Act when there was no evidence in the record to support the conclusion that an inspection would have discovered the substance on the gangway step in which the plaintiff slipped).

In order to adopt Reed's position, a jury would have to speculate, without any factual support, that the pins broke either before the gangway was lowered into place or before the captain performed his last monthly inspection of the Ship, and thus, the Defendants could have discovered the missing pins in an inspection. While Reed is entitled to all reasonable inferences from the evidence, "inferences must be more than speculation and conjecture to be reasonable." *Roberts v. Unidynamics Corp.,* 126 F.3d 1088, 1092 (8th Cir.1997), *pet. for cert. filed,* Feb. 26, 1998; *see also Fought v. Hayes Wheels Int'l, Inc.,* 101 F.3d 1275, 1277 (8th Cir.1996) (noting that "a reasonable inference is one 'which may be drawn from the evidence without resort to speculation' ") (quoting *Sip–Top, Inc. v. Ekco Group, Inc.,* 86 F.3d 827, 830 (8th Cir.1996)). "When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate." *Fought,* 101 F.3d at 1277. Reed cannot create a factual dispute regarding the Defendants' breach of their duties to him under the Act based upon mere speculation. *Colonial Ins. Co. v. Spirco Envtl., Inc.,* 137 F.3d 560, 562 (8th Cir.1998) (noting that a

---

**2.** The parties agree that if both pins were missing before Reed walked on the step, it would have fallen to a vertical position. The step, however, was in a horizontal position when Reed walked on it, and then it collapsed. (*See* Attachment to Bishop Aff. (Reed's accident reports).) Therefore, at least one, but maybe both, of the pins were in place shortly before the accident occurred. There is no evidence, however, indicating that only one pin held the step in place for any length of time before Reed's accident. Thus, in order to conclude that the Defendants negligently failed to inspect the gangway, a jury would have to speculate that one of the bolts was missing either before the Ship moored at the Peavey Dock or before the captain conducted his last inspection of the Ship, and therefore, the missing pin could have been discovered and fixed as a result of a proper inspection.

"factual dispute [that] consists only of speculation ... is insufficient to avoid summary judgment.")

Reed also argues that he has created a genuine issue of material fact regarding whether the Defendants breached their duty under the Act by failing to provide a gangway watch who would have noticed the defective step. (Pl.'s Mem. at 10.) This argument, however, suffers from the same flaw that the Court noted previously. Reed has presented no evidence that a gangway watch would have been able to see the defect in the step before his accident—i.e., that one or both of the pins underneath the step were missing or were broken.[3] Instead, the record indicates that the step was in its proper, horizontal position immediately before Reed's accident. Reed cannot create a factual dispute based upon mere speculation. *Colonial Ins. Co.*, 137 F.3d at 562. The Court, therefore, will grant the Defendants' Motion for Summary Judgment.

## Conclusion

Based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 27) is **GRANTED,** and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**3.** Reed cites to *Sarauw v. Oceanic Navigation Corp.,* 622 F.2d 1168 (3d Cir.), *judgment vacated by* 451 U.S. 966, 101 S.Ct. 2039, 68 L.Ed.2d 344 (1980), *and aff'd. on remand,* 655 F.2d 526 (3d Cir.1981), as support for his contention that the Defendants breached their duty to him under the Act by failing to provide a gangway watch. (Pl.'s Mem. at 11.) *Sarauw,* however, is distinguishable from the instant case. In *Sarauw,* the Third Circuit found that a shipowner was negligent under the Act when a longshoreman fell from a gangway that the shipowner had failed to secure onto the vessel. *See Sarauw,* 622 F.2d at 1173–74. The Seventh Circuit concluded that, had the shipowner provided a gangway watch, she would have seen that the gangway's ropes and chains were not tied down, and could have alerted the plaintiff to the dangerous condition. *Id., aff'd. on remand,* 655 F.2d at 528. Thus, in *Sarauw,* unlike the instant case, the defect that caused the plaintiff's injuries would have been visible to a gangway watch.